(No. 20606.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ANDY E. DUNHAM, Plaintiff in Error.

*Opinion filed April 23, 1931—Rehearing denied June 4, 1931.*

DAVID C. WILLIAMS, and COSTIGAN & WOLLRAB, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, VERNON BRIGGS, State's Attorney for Brown county, A. W. SCHIMMEL, State's Attorney for Pike county, and JOHN P. MADDEN, for the People.

Mr. CHIEF JUSTICE DUNN delivered the opinion of the court:

This writ of error was sued out to review the judgment of the circuit court of Brown county by which the plaintiff in error, Andy E. Dunham, was convicted of forgery. The indictment was returned in the circuit court of Pike county at the April term, 1930, and the venue was changed, on the petition of the defendant, to Brown county. The cause was tried in that court at the September term, 1930. The first of the three counts of the indictment was *nollied* during the trial by the State's attorney and the jury returned a verdict finding the defendant guilty on the other two counts. The second count of the indictment charged that the defendant on June 4, 1927, feloniously and fraudulently attempted to pass, utter and publish to the Farmers State Bank, a corporation, a forged check for the payment of money purporting to be made and executed by Earl Dunham, Andy E. Dunham well knowing the check to be false, forged and counterfeited. This count charged the defendant with the intent in passing the check to defraud the Farmers State

Bank. The third count was like the second, except that it charged the intent to be to defraud Earl Dunham.

The facts testified to without any contradiction are, that the defendant was a farmer living about two and a quarter miles south of New Salem, who was a depositor in the New Salem State Bank and had been a depositor for several years prior to June 4, 1927. He was the owner of thirteen shares of stock in the bank, but was not, and never had been, a director or officer. Albert Gerard was the cashier of the bank and Mildred Lytle, his daughter, was assistant cashier. The check charged to have been forged was drawn on the New Salem State Bank, dated June 4, 1927, payable to A. E. Dunham or order, for $1461.02, and purported to be signed by Earl Dunham, who was a brother of the defendant, and testified he did not sign the check or authorize any other person to do so. It bore the indorsement, "A. E. Dunham for credit." The check was received at the Farmers State Bank at Pittsfield, Illinois, in the mail on Monday morning, June 6, 1927. Two other checks were inclosed in the envelope with it. They were all credited to A. E. Dunham, subject to final collection. Dunham came into the bank shortly before noon that day and asked if the bank had had a telephone message from a Quincy bank regarding some checks, and being told that it had, he further asked if he had a deposit of credit in the mail that morning and was told that he had, and he then asked for a draft for the amount of the three checks. This was refused, and he was told that the bank would send the checks to the New Salem bank for collection. He then asked for the cash, but was told the bank would not give him cash for the checks. The writing on the face of the check, including the signature, was the handwriting of Mrs. Mildred Lytle, the assistant cashier of the New Salem State Bank, and the indorsement, "A. E. Dunham for credit," was also in her handwriting. One of the two other checks was introduced in evidence. It purported to be signed by C. L. Dunham, was dated

June 4, 1927, payable to A. E. Dunham or order, and its amount was $1241.86. It bore the indorsement, "A. E. Dunham." The writing on the face of the note and the indorsement was in the handwriting of Mildred Lytle. C. L. Dunham was a cousin of the defendant and he did not sign the check or authorize any other person to do so. On Monday morning, June 6, 1927, Mildred Lytle came to the house of the defendant and told him that she had sent some checks over to the Farmers State Bank and wanted to know if he would go over there and get a draft and bring it back to the New Salem bank, saying then she could get those checks straightened out. She told the defendant his name was on the back of them and she had written it there. He had not known anything about it prior to that time. He lived about two miles and a quarter from the bank. After this conversation he went over to the Farmers State Bank and talked to Grigsby, the cashier, asking him for a draft for the checks. One of the checks was for hogs the defendant had shipped with one Seybold. Its amount was $849 and it was a valid check. It is not involved in this case. The other two were the checks which have been described. The New Salem State Bank closed its doors on June 6, 1927, and suspended payment.

Blanche McGary testified that she was a court reporter for Pike county, knew the defendant and heard him testify at his trial in April, 1929; that he said that Mildred Lytle told him about June 4 or 5, 1927, that she had written the face and back of the check described in the indictment and sent it down to the Farmers State Bank at Pittsfield, and she wanted him to go to the bank and get a draft or cash for the amount and bring it back to the New Salem bank. He was asked if he knew at that time it was a forgery and he said he did. He said he came down to the Pittsfield bank and attempted to get the cash or a draft for it.

The defendant testified denying nothing which has been stated. He testified that at the trial in April, 1929, he tes-

tified just as Miss McGary said he did. On the trial of the present case he testified that in asking for the draft his intentions were to get this straightened up for the cashier, Mrs. Lytle. He did not receive a draft or cash for any of these checks. Mrs. Lytle told him if he would go over there and get a draft that would straighten up the affair of these checks—that she could straighten it up. He had no other intention or intent than to obtain a draft to straighten up those checks. He did not know what there was to straighten up about them. That was her conversation. In the conversation with Grigsby and Coley at the bank no particular mention was made of the check, People's exhibit "1." He asked for a draft for the checks that came over in the mail. He understood that two or three checks came in a letter. He had not seen either of the checks that were introduced in evidence and did not mail those checks or any checks to the bank. The third check Seybold had given to Gerard, the bank's cashier, for hogs that the defendant shipped with him. He had not had possession of the Seybold check and had not seen it before it was sent to the Farmers State Bank.

The errors assigned and argued upon which the plaintiff in error relies for the reversal of the judgment are these: (1) There is no proof that the Farmers State Bank is a corporation; (2) error in the admission of evidence over the defendant's obbjection; (3) error in refusing to admit proper evidence offered by the defendant; (4) giving improper instructions for the People and refusing proper instructions requested by the defendant; (5) improperly mingling instructions given at the request of the People and instructions given at the request of the defendant; (6) the verdict is contrary to the law and the evidence.

1. The People expressly admit that it was necessary to charge in the second count of the indictment that the Farmers State Bank was a corporation and to prove it, but not in the third count, which charges the intent to have been to

defraud Earl Dunham, whose name appears as the drawer of the check. The act to regulate proof in criminal cases of June 3, 1889, provides that in all criminal prosecutions requiring proof of the legal existence of a corporation, user shall be *prima facie* evidence of such existence. (Laws of 1889, p. 115.) Since January 1, 1921, it has been unlawful, by reason of section 15½ of the general Banking act, for any natural person or persons, firm or partnership to transact the business of banking or receiving money upon deposit, or to use the word "bank" or "banker" in connection with such business. The evidence shows that the Farmers State Bank did a banking business and had done so for sixteen years, that it had officers, a cashier and an assistant cashier, received deposits and paid checks, and that the defendant did business with the bank, had an account there and his checks frequently went through the bank. It thus appears that it was an organized body in the actual user of the privileges and franchises which the law confers upon banking corporations and prohibits to natural persons, and the performance of the functions of a bank in the usual manner of such performance, and this evidence gave rise to the presumption that it was being conducted lawfully and was under the statute *prima facie* evidence of the bank's lawful existence as a corporation. Similar evidence in the case of a railroad company was held, in the absence of countervailing evidence, sufficient proof of user to support an allegation of corporate character in *People* v. *Fitzgerald,* 297 Ill. 264; and in *Graff* v. *People,* 208 Ill. 312, there was a like holding in regard to an insurance company.

2. It is contended that the court erred in admitting in evidence People's exhibit "2," which was the check purporting to be signed by C. L. Dunham and indorsed by the defendant. This check, as the evidence shows, was drawn at the same time as the check purporting to be signed by Earl Dunham, and the defendant was informed of the fact at the same time. There was no error, for in prosecutions for

forgery it is permissible to prove that about the same time the defendant had in his possession or passed or tried to pass other forged checks, as tending to show intent or guilty knowledge. *Steele* v. *People,* 45 Ill. 152; *Cross* v. *People,* 47 id. 152; *Anson* v. *People,* 148 id. 494; *People* v. *Dougherty,* 266 id. 420; *State* v. *Murphy,* 17 N. D. 48; *Lindsay* v. *State,* 38 Ohio St. 507; *Commonwealth* v. *Russell,* 156 Mass. 196.

3. The defendant offered evidence of his good reputation for honesty and integrity. Some of the witnesses testified that they were acquainted with his general reputation for honesty and integrity and it was good, and upon cross-examination stated that they had not heard his reputation discussed. Thereupon the State's attorney moved to strike the evidence, and the court sustained the motion and the testimony was not admitted. In every criminal case it is competent for the defendant to prove his good character, and it is not necessary that the witnesses called for that purpose should be able to state that they have heard his reputation discussed or mentioned. His reputation may be known though never generally discussed. "Indeed, one whose word passes current among his associates and neighbors, or who is received and accepted by society as a virtuous man or woman, or whose honesty is not questioned in the community in which he lives, will ordinarily excite no discussion or comment, and yet every person in the community knows that he or she is accepted, recognized and reputed to be a truthful, virtuous or honest person." (*Gifford* v. *People,* 148 Ill. 173.) One of the witnesses in this case testified, "I know what the opinion of the people was, because it was not discussed;" and another, "If anybody's character is not good you always hear that before you hear otherwise." It was error to strike out this testimony. (*People* v. *Savage,* 325 Ill. 313; *People* v. *Huffman,* id. 334.) The error, however, was not prejudicial, for there could have been no other verdict than guilty on the defendant's own testimony.

4. Complaint is made of the giving of instructions Nos. 3, 4, 5, 6 and 10. Instructions Nos. 3, 5 and 10 assume that the check, exhibit "1," was forged. The defendant was on trial for uttering a forged instrument and he admitted it was forged. It was not prejudicial to him for the court to assume in his instructions that the check was forged. Instruction No. 4 given for the People is on the subject of circumstantial evidence. The plaintiff in error insists there was no circumstantial evidence in the case and the court should not have instructed the jury on that subject. However, his instruction No. 23 is on the same subject, and therefore he cannot complain that the court gave an instruction on the same subject. He does not claim that the instruction mis-stated the law. Instruction No. 6 was erroneous in singling out the defendant as a witness and telling the jury that if they find that he willfully or corruptly testified falsely to any fact material to the issue they might entirely disregard his testimony except so far as it was corroborated by other credible testimony. The court in instruction No. 17 given for the defendant told the jury that they had no right to discredit the defendant's testimony from caprice or merely because he was the defendant but should treat him the same as any other witness and subject him to the same tests, and only the same tests, as are legally applied to other witnesses. Nowhere was the discrediting of a witness on account of his having willfully and corruptly testified falsely to a fact material to the issue called to the attention of the jury as a test to be applied to any witness other than the defendant. If there were any room to question the correctness of this verdict the judgment would have to be reversed, but, as we have already said, the defendant's own evidence requires a verdict of guilty. The substance of the instructions asked by the defendant which were refused was given, so far as they contained proper statements of the law, in other instructions which were given. Instruction No. 32 refused, stated that the jury should not be prejudiced against the

defendant because his wife was not called as a witness, and that the law is that the wife of the defendant was not a competent witness and could not be permitted to testify in the case. The instruction was properly refused. There was no reason why it should have been given. The defendant's wife is not mentioned in the record, and there is no indication that there was anything in the case which she could have testified to if she had been permitted to do so.

5. Counsel for the plaintiff in error in their argument complain that the court in the case at bar intermingled instructions offered on behalf of the State with those offered on behalf of the defendant, to the great prejudice of the defendant, and say that these instructions appear on pages 285 to 312 of the record in the order in which they were given by the court, and as set out in the bill of exceptions and in the abstract they appear as they were arranged by the court reporter, and when the abstract was being prepared counsel for the defendant did not have before them a copy of the record, hence it was impossible to set them out in the abstract in the order in which they were given by the court. The instructions given at the request of the People, those given at the request of the defendant and those refused are shown in that order in the bill of exceptions, beginning on page 430 of the transcript of the record and ending on page 444. There is no basis, therefore, for the statement that the instructions given on behalf of the State were intermingled with those given on behalf of the defendant. Counsel are mistaken in their statement that parties submitting instructions are entitled to have them given in the order in which they are submitted. There is no such rule of law or practice. Instructions given to the jury are the charge of the court as to the law. He may reject all the instructions which are presented and give the charge in his own language. The instructions constitute a connected charge, and if the charge is correct in its statements of the law and covers the principles proper to be given to the jury it is

sufficient. The order in which those principles are to be stated is within the discretion of the court. The transcript certified by the clerk does contain a series of instructions, but this series can have no weight in the consideration of the case because occurrences on the trial can be brought into the record only by a bill of exceptions.

6. It is argued that the verdict of the jury is the result of passion and prejudice and is contrary to the law and evidence in this case, and in support of the argument it is contended that proof beyond a reasonable doubt was not made of the intent to defraud. The defendant testified that he intended to obtain a draft for the three checks; that Mrs. Lytle said the bank was in bad condition; that she had sent the checks to the Farmers State Bank and wanted him to go and get a draft and bring it back to the bank and it would be straightened up, and that his intention was to get this straightened up for Mrs. Lytle, and it is insisted that he innocently acted upon the persuasion and appeal of the assistant cashier of the bank in order to assist her in straightening out these checks on which he was informed his name appeared, and it is claimed that the record discloses no criminal intent whatever. This check was forged and the defendant knew it. He knew that the bank was not in a good condition, and, in fact, it failed to open its doors the next day. He intended to get the money on the check and take it back to Mrs. Lytle—that is, to use it for her purposes or his purposes. This was necessarily a fraud on the bank, for it had no authority to pay the money to him and would have had to pay it over again to Earl Dunham, the apparent drawer of the check. His actions were inconsistent with a freedom from fraudulent intention. The verdict was sustained by the evidence. No other verdict could have been returned.

The judgment is affirmed.

*Judgment affirmed.*