THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOHN W. PARTEE, Defendant-Appellant.

(No. 58180;

First District (2nd Division)—January 16, 1974.

Gordon Waldron, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Jonathan B. Gilbert, Assistant State's Attorney, of counsel), for the People.

Mr. JUSTICE STAMOS delivered the opinion of the court:

After a bench trial, defendant, John Partee, was convicted of two counts of indecent liberties with a child and two counts of deviate sexual assault. Following argument on the post-trial motions, the court ordered an arrest of judgment on the two counts of deviate sexual assault because they arose out of the same conduct as alleged in the two counts of indecent liberties. Defendant was sentenced to the penitentiary for a term of not less than 4 nor more than 8 years on each of the two counts of indecent liberties with the sentences to run concurrently. On appeal, defendant contends that he was not proven guilty beyond a reasonable doubt; that the court prejudicially prohibited defendant from presenting an adequate defense; that the court improperly allowed into evidence prior convictions of defendant, that the State violated its obligation of promptly bringing the defendant to trial pursuant to chapter 38, section 103—5 of the Code of Criminal Procedure; and that the court erred in convicting defendant of two counts of indecent liberties with a child.

Due to the nature of the charge and the issues raised by appellant, a recitation of the evidence is appropriate.

The complaining witness, Bruce Burke, testified for the State. On October 18, 1971, Bruce, who was fifteen years old, lived at 6450 South Blackstone, and attended Hyde Park High School at 6220 Stony Island. That morning, at approximately 8 A.M., he left for school. He walked east to Harper Street, stopped at a candy store, and then headed north on Harper where he saw Delores and Dorothy Smith and Pamela Mallory going across a vacant lot between 63rd Place and 63rd Street. A brief conversation ensued, ending with Bruce throwing some candy at the girls.

At about 8:10 A.M., while still walking north, Bruce testified that he was grabbed from behind by a man whom he later identified as defendant, John Partee. The incident occurred on Harper in the vicinity of 63rd Place shortly after his meeting with the three girls. He further testified that defendant had one hand around his neck and the other on his collar. Bruce asked to be let go, whereupon defendant asserted he was a police officer. The witness was then taken by force along the street to an apartment at 63rd Place and Blackstone, pushed inside with the

door locked behind him, and remained there approximately one to one-and-one-half hours.

While in the apartment Bruce was asked to scratch defendant's head with a comb. When the defendant sat down, Bruce attempted to escape, but was thwarted and thrown on the couch. At defendant's request, Bruce rubbed body lotion on the defendant's back, but declined the offer to rub the same substance on the witness' chest. Partee then attempted to force Bruce to submit to an act of oral copulation, but the witness clinched teeth to frustrate defendant's continued efforts. The witness yelled, and defendant responded by grabbing him, telling him to keep quiet, and assuring him that he would not be hurt. Partee then threw Bruce to the floor and forcibly removed his trousers. Holding the witness, defendant forced Bruce to submit to an act of anal copulation for approximately ten minutes, and upon withdrawal, ejaculated on the witness' buttocks.

Bruce testified that defendant then asked him to pull up his pants and clean himself in the bathroom. The witness complied, and when he came out, Partee was sitting down and said he was sorry and that he didn't want Bruce to reveal what transpired. Bruce replied that he would remain silent if Partee would release him. Partee then walked to the bedroom door, and Bruce picked up a wall plaque in the shape of a ballerina and threw it at defendant. The wall plaque broke when it fell to the floor. Immediately thereafter, Bruce escaped by unlocking the door and fleeing on 63rd Place and Harper to the Scott school, where he was seen and questioned by Iree Robinson.

Mary Ann Mohan was next called to testify for the State. She testified that she had been a microanalyst for the Criminalistics Division for the Chicago Police Department for two years. On October 19, 1971, she received by police mail a pair of undershorts identified as belonging to Bruce Burke. On the same day, she examined the undershorts by eye and through a miscroscope. "The interior portion of the rear panel exhibited a dried whitish stain." Three extracts were taken from this area and upon examination, "all three exhibited human spermatozoa." The witness had no way of identifying from whose body the spermatozoa came.

Iree Robinson then testified for the State. On October 18, 1971, she was employed at the Walter Scott School at 6435 South Blackstone. While looking out the school lunchroom window, she saw Bruce traveling south on Blackstone between 9:00 and 9:15 A.M. She stated that she approached and talked to Bruce, commenting "He was very, very upset. He was crying. He was shaking and his clothes was kind of disarray on him." After being asked several times "[W]hat was the matter,"

Bruce made reference to being attacked and pointed toward 63rd and Blackstone saying "that man." The witness saw no one in the direction to which the victim pointed. Mrs. Robinston then took Bruce home to his sister who summoned the police.

Both arresting officers, Davis and Taylor, testified for the State. They were sent by radio to 6450 Blackstone on October 18, 1971, where they met Bruce Burke and his sister. They proceeded to 63rd Place and Blackstone where Bruce told them he had been forcibly taken. While unsuccessfully attempting to get a response at the front door of the Partee apartment, the victim indicated to the police that he had just seen the defendant leave the rear of the building. The officers pursued defendant who was subsequently seen by Officer Davis while "he was hiding in a basement of an abandoned building at, near the corner of 64th and Blackstone," and arrested. Officer Davis testified that the arrestee was identified by Bruce Burke as his assailant and was the defendant, John Partee.

The officers removed defendant and Bruce to the police station where the victim related to the police, for the first time, the sexual aspects of the case. At this point, the victim's undershorts were sent to the crime lab, and Bruce was taken to Woodlawn Clinic for an examination.

Investigator Bullington interrogated defendant at the police station and testified for the State. The record reveals that Partee's relation of events to this witness correspond to defendant's testimony at trial. The witness testified that he also talked to the victim and did so several times as "he seemed kind of bashful and I should say embarrassed."

Bruce's mother, Mary Burke, also testified for the State. Prior to attending Hyde Park High, Bruce was enrolled in the Enrico Fermi School, but had transferred to Vincennes School for eighth grade because his mother had been having problems with him "ditching," and "playing hooky from school." Mrs. Burke also testified that her son had mentioned to her that two girls, whose names he gave her, witnessed his being grabbed on the street.

After the State rested its case, Mary Gray, who lives at 1509 E. 63rd Place, and Catherine Bell, residing at 1507 E. 63rd Place, both testified for the defense. Both witnesses, who are neighbors of John Partee, were on Mrs. Gray's front steps on October 18, 1971, at about 8:30 A.M., and later on both saw a boy in a police car at the time of John Partee's arrest. The women were together from 8:25 until 9:15, going into Mrs. Gray's apartment once during this period.

Both witnesses had seen the boy in the police car previous to the time of Partee's arrest. Mrs. Bell saw him on the street three times between 8:30 and 8:45 to 8:50. She also saw him running on 63rd Place at about

8:50 to 9:10 A.M. at which time he was chased by Mrs. Gray's dog. Mrs. Gray also saw the boy from the police car several times that morning. He was in a vacant lot bordered by Harper, Blackstone, 63rd Street, and 63rd Place between 7:30 and 8:00 A.M., for approximately thirty to forty minutes. She saw him again at 9:15 or 9:30, and about fifteen to thirty minutes later when he was running and her dog pursued him. Both women testified that the boy's clothes appeared in order when they saw him running and there was a police car behind him on the street at the time. Mrs. Bell remembered Bruce Burke testifying at a preliminary hearing on November 9, 1971, and said he didn't look like the boy she had seen several times on October 18.

Both witnesses saw John Partee on the street on the morning of October 18, prior to his arrest. Mrs. Bell saw him standing on 63rd Place in front of his apartment at about 8:30. Mrs. Gray saw him walking toward his apartment between 8:20 and 8:40 A.M. and again at about 10:00 walking on 63rd Place and across a vacant lot beside her house.

Mrs. Bell and Mrs. Gray approached the police car where John Partee was taken after his arrest. Upon Mrs. Gray's request, the police gave her the keys to Partee's apartment, and the two women subsequently locked it. Mrs. Bell testified that there was nothing unusual about the interior.

Chris Partee, defendant's sister-in-law with whom he lives, testified on his behalf. On October 18, 1971 at about 9:30 in the morning she was contacted at work about the arrest of John Partee. She returned to her apartment shortly thereafter and found it in the same condition as when she left for work at about 7:30 in the morning. She found no broken objects in the apartment, and saw no clothing lying around or any stains.

Mrs. Partee was shown an object and identified it as a wall plaque depicting four ballerinas. It was in her apartment on October 18, 1971, on the wall facing the door on 63rd Place. She at no time had in her apartment any statue in the shape of a ballerina. She did have a small statue of Abraham Lincoln. The identified object was in the same condition as it was on October 18, 1971, and it wasn't broken or cracked.

James Richmond, as Assistant Principal at Hyde Park High, also testified for defendant. Mr. Richmond brought with him, pursuant to subpoena, the school records of Bruce Burke. Contained therein was an "exclusion slip" indicating the exclusion of Bruce on October 14, 1971, and stating he will not be readmitted to school until his parent comes in for a conference on October 19.

Delores Smith testified for the defense. On a morning in October, 1971, she, her sister Dorothy, and Pamela Mallory saw Bruce coming out of a building between 63rd Street and 63rd Place. He was in back

of Delores when he came out of the building and hit her with a piece of candy. Some exchange of words followed and then she and her companions continued north on Harper.

When Bruce threw the candy at her, there was nobody nearby. She didn't see Bruce being grabbed or chased down the street. After he threw the candy she looked back and saw "nobody, nothing."

John Partee testified on his own behalf. On the day of his arrest, he was living at 6333 South Blackstone with his brother and sister-in-law. On October 18, 1971, he left his employment at the Conrad Hilton Hotel at about 7:35. A coworker, whose name he cannot recall, drove him to the corner of 63rd Street and Blackstone. He walked to his apartment, stayed there for several minutes, and then left to go to the Gulf station at 64th and Stony Island to buy some cigarettes. Returning from the filling station, he saw three girls crossing the street at 64th and Harper and they continued north on Harper in front of him. He went north on Harper and then crossed a vacant lot to 63rd Place. At that time the girls were alone. There was a boy sitting on the steps of a residential building at the end of 63rd Place and Harper.

Partee returned to his apartment by crossing a vacant lot and then passing the buildings where Mrs. Gray and Mrs. Bell live on 63rd Place. He passed by the women sitting on the steps although he had not seen them fifteen minutes earlier. He got back to his apartment at about 8:20 or 8:30. After he got to his apartment door, he noticed that the girls had walked up the street so that they were in front of the boy, who was sitting on the steps of the building at the end of 63rd Place and Harper. He saw the boy throw something at the girls. He went into the apartment and turned on the radio, leaving the door open because he wasn't going to stay in the apartment. He went back to the doorway of the living room and stood at the door for three to ten minutes. From the doorway he could see along 63rd Place from Harper to Blackstone. He then saw the boy come down 63rd Place on the opposite side of the street. The boy walked to where Partee's brother had parked his car across the street, and then crossed the street at an angle, coming in front of the building where John was standing. He had not said anything to the boy or made any kind of gesture or physical movement. The boy came near where Partee was standing and said "What's happening?" Partee said "Nothing." He asked the boy if he wasn't supposed to be in school and the boy said that he had been suspended and didn't have to be in school, and asked for a drink of water. At this time the apartment door was still open and the radio was on. Partee let him get a glass of water. He came into the living room and Partee pointed in the direction of the kitchen, around the corner and down the hallway. The

boy went into the kitchen, drank some water, and while he was coming out, Partee was in the hallway and picked up the phone and told him that he was going to call the police. He actually couldn't call the police because there was a lock on the phone, but he pretended to as a joke to see how the boy would react. The boy ran from the apartment. He may have been frightened, but he wasn't crying. The boy was not in the apartment for more than five minutes. Partee testified that at no time had he had any sexual relations with the boy.

When the boy ran out the door, Partee testified that he went to the door to close it but did not go outside. He heard Mrs. Gray's dog barking and her telling the boy not to run because the dog wouldn't bite. Partee stayed in the apartment several minutes and then left to meet an acquaintance. After unsuccessfully looking for his friend, Partee waited by an abandoned building on 64th and Blackstone. After waiting for fifteen minutes, he looked up and saw a police officer coming from 63rd Place in the alley between the Partee's building and Mrs. Bell's building. The officer was walking with a gun in his hand. Partee was standing near some steps of the vacant building and he stepped down the steps because the officer had his gun drawn out in front of him and he thought he might get shot. The officer arrested him.

A stipulation was entered that if Mr. R. Warren were called as a witness he would testify that he is a counselor at the Dyette School; that in the school year prior to this one he was a counselor at Vincennes High School and that he knew Bruce Burke, who was enrolled there; that the year before he was a teacher at Fermi High School, where Bruce Burke was then enrolled; that other school officials had talked to him about Bruce Burke; and that the reputation of Bruce Burke for truth and veracity is bad.

In rebuttal the State offered into evidence a certified copy of five felony convictions for burglary and larceny on April 7, 1969 of the defendant.

OPINION

■■ Where a conviction for the crime of indecent liberties is based upon the testimony of the complaining witness, and defendant denies the charge, the testimony of that witness must be clear and convincing or must be corroborated by other substantial evidence. *People v. Kolden,* 25 Ill.2d 327, 185 N.E.2d 170.

Defendant contends that the State has failed to sustain its burden of proof under this standard in that the complainant's testimony was neither clear and convincing nor substantially corroborated, and was directly contradicted by the testimony of defendant and other witnesses.

Defendant first urges that the complainant's testimony relating to

events before, during, and after the alleged sexual assault is implausible. More specifically, defendant complains that the circumstances surrounding the abduction are incredible; that the victim's account of the actual sexual assault is a physical impossibility; and that Bruce's description of his escape is so implausible as to cast doubt on his entire testimony. We disagree in defendant's assessment and characterization of the circumstances. To avoid undue length, we think it unnecessary to address ourselves to the numerous specifics raised by appellants. It is sufficient to say that after a careful examination of the record and authorities cited, we find no inherent improbabilities in complainant's testimony, nor do the authorities cited compel an opposite conclusion.

Appellant further maintains that the testimony of complainant exhibited several inconsistencies and was, therefore, not clear and convincing. At trial complainant stated that he had not walked farther north than at the point where he was grabbed, but later stated that he had thrown candy at the three girls while they were "down a bit further on Harper." On direct examination complainant stated that he threw something at defendant after having come out from the bathroom; on cross-examination complainant testified that he entered the kitchen after going into the bathroom and threw the object at defendant after leaving the kitchen; and at the preliminary hearing it was stipulated that the complainant was asked, "How did you get out?" and that he answered, "I hit with a—it was a thing that you supposed to hang on the wall. It was laying on the table and I threw it and after he got up and started for the door." Further, at trial Bruce testified that as he ran out of the apartment he was chased by a dog but didn't see any women there; at the preliminary hearing he stated: "I kept running and a lady who was sitting on the porch and she had two dogs and one of them came after us."

■■ In reviewing the alleged inconsistencies, we are of the opinion that they do not seriously detract from the credibility of complainant's testimony. First, it appears from the record that the spatial distance between the point where Bruce was grabbed and the point where he threw the candy is so minimal as to be of small consequence. Secondly, complainant's failure to mention going into the kitchen after leaving the bathroom on direct examination was more an error of omission rather than inconsistency. Further, we think it significant that the omission occurred in the context of a rather lengthy narrative rather than guided step-by-step questioning. Finally, the inconsistencies relate not to the actual crime itself, but to collateral events. In *People v. Wendt*, 104 Ill.App.2d 192, 244 N.E.2d 384, this court sustained a conviction for indecent liberties where the complainant's testimony contained several incon-

sistencies relating to collateral events and the criminal act itself. As in *Wendt,* we note the difficulties—the traumatic episode which the child's recollection must reconstruct coupled with the lapse of time between the occurrence, the preliminary hearing, and the trial—which inhere in cases of this nature. When the inconsistencies relate to collateral matters, this court will not substitute its judgment for that of the trial court's where complainant's testimony is clear and convincing as to the essential elements of the crime. As to the alleged indecent act, Bruce's testimony was detailed and unshaken on cross-examination.

■■ Finally, defendant urges that the testimony of complainant is not clear and convincing because of the State's stipulation that Mr. Warren, if called, would testify that Bruce's reputation for truth and veracity is bad. We note that the stipulation, not subject to cross-examination, is simply one of the factors to be considered by the trier of fact. It must be assumed that the court assessed its probative value in light of the testimony adduced at trial. A reviewing court cannot appraise the candor and truthfulness of a witness except as it appears from the printed record. Judging the credibility of the witness in that qualified sense, we conclude that the testimony of Bruce was not so improbable or unreasonable or unworthy of belief as to require the finding of the trial court to be disturbed. *People v. Kirilenko,* 1 Ill.2d 90, 115 N.E.2d 297.

■■ Although we have concluded that complainant's testimony was clear and convincing, we wish to note that it was substantially corroborated as to circumstance and the act itself. Bruce's presence on Harper just prior to his encounter with Partee was established as to time and place by Delores Smith. Partee himself admitted observing Bruce during and shortly after the victim's encounter with Delores Smith and her friend. Partee also provided corroboration for Bruce's testimony that he was in the defendant's apartment on the morning in question. Bruce's testimony regarding his escape was substantiated by defendant who testified that Bruce ran out the door and was chased by Mrs. Gray's dog. Similarly, Mrs. Gray and Mrs. Bell both testified that they saw the victim running on the street between 8:50 and 9:45 A.M., being chased by Mrs. Gray's dog.

■■ In addition, we think the corroboration of the sexual activity is significant. Mrs. Iree Robinson stopped Bruce on Blackstone between 9:00 and 9:15 A.M., describing him as very upset and crying, with his clothes "kind of disarray." He related to her what had happened and indicated a location in the direction of 63rd and Blackstone. Defendant contends that the testimony is of no corroborative value since it was not an immediate complaint, but elicited only after Mrs. Robinson questioned him as to "What was the matter." Although failure to make an

immediate complaint is sometimes considered a factor in evaluating the sufficiency of the corroboration (see *People v. Adams*, 115 Ill.App.2d 360, 253 N.E.2d 23), we think the circumstance of being unexpectedly stopped prior to reaching his destination coupled with his extremely agitated emotional state sufficiently explain the lack of immediacy. We also think it significant in this regard that Investigator Bullington described the victim as "bashful" and "embarrassed."

Further, the testimony of Miss Mohan who identified the whitish stain on the "rear panel" of Bruce's undershorts as human spermatozoa strongly corroborates complainant's story.

Lastly, defendant asserts that the testimony of complainant was substantially contradicted and made more implausible by the testimony of defendant and other witnesses. Again, without discussion of specifics, we disagree with defendant's assessment of the evidence. In its entirety, the record exhibits minor inconsistencies relating to collateral matters; the only material conflict of evidence lies in the respective testimony of the complainant and the accused concerning the events which transpired in the apartment. In this respect, it is well-settled that the credibility of the witnesses and the resolution of the conflicting testimony was a matter for the trial court. *People v. Woodruff*, 9 Ill.2d 429, 137 N.E.2d 809; *People v. Kirilenko*, 1 Ill.2d 90, 115 N.E.2d 297; *People v. Wendt, supra.*

In summary, we believe that the State's evidence was sufficient to sustain the conviction, and in viewing the totality of evidence, we find nothing which requires a substitution of our judgment for that of the trial court's.

Defendant next contends that the court committed reversible error by prohibiting the presentation of an adequate defense. The attack is three-pronged. First, it is urged that defendant was prejudiced by the court's ruling on his pretrial discovery request for the names of occurrence witnesses and persons who observed complainant three hours before or after the alleged offense. The request was grounded on Supreme Court Rule 412(h) which provides:

> "Upon a showing of materiality to the preparation of the defense, and if the request is reasonable, the court in its discretion may require disclosure to defense counsel of relevant material and information not covered by this rule."

The defense had in its possession the names of witnesses that the State intended to call, the trial judge, in refusing the request, reasoned that defendant's investigation of those witnesses would readily reveal who was an occurrence witness and who was not. We concur in the trial court's finding that the denial placed no particularly onerous burden

upon the defense, and conclude the trial judge's denial was within the ambit of his discretional authority.

■■ Defendant advances another theory, for the first time on appeal, urging error in the trial court's denial. He notes that both Mrs. Bell and Mrs. Gray testified that a police car was in the street behind complainant when he was chased by the dog, and that Mrs. Gray testified that there were school crossing guards in the area. Therefore, he concludes, the names of these individuals should have been provided by the State under his discovery request. We disagree. Not only do we question the materiality of the alleged witnesses, but we fail to see how the defendant can now complain of prejudicial error when the knowledge of these supposed individuals was gained through defendant's own witnesses, and no specific request was made in the trial court for their identity. Patently, defendant's request fails to meet the requirements of materiality and reasonableness under Supreme Court Rule 412(h).

The defendant next complains that the court's failure to require the State to specify in a bill of particulars the rooms of the apartment where the offense took place was prejudicial. However, the record indicates that Bruce testified as to these events at the preliminary hearing and before the grand jury, and that a transcript of the testimony was made available to the defendant. We are unable to discern, nor does defendant demonstrate, any resultant prejudice from the ruling. We therefore reject the contention.

The defendant also asserts that the court erroneously and prejudicially limited the scope of his cross-examination. The record does not support this contention. Defendant's principal complaint is that defense counsel was not allowed to ask Bruce whether he had been previously stopped by a police officer for truancy, and was unable to inquire of complainant's mother if Bruce had informed her of his suspension. Although the disallowance of these inquiries, standing by themselves, is questionable under the rule which provides for wide latitude in cross-examination of State witnesses in sex cases (*People v. Rainford*, 58 Ill.App.2d 312, 208 N.E.2d 314.), the defendant here was not prejudiced. The thrust of these inquiries were directed to Bruce's truancy problem; yet the same purpose was served by the mother's testimony of Bruce's truancy problem and by the admission of Bruce's school records. Under these circumstances we cannot say that the court committed reversible error.

Defendant further complains of not being able to impeach complainant during a colloquy which attempted to establish whether it was Bruce's belt or pants which were unbuckled. After complainant testified

that "my pants were unbuckled, unzipped. My belt was buckled," defense counsel asked the following question: "You ever recall stating that your belt was in fact unbuckled?" The trial court, in sustaining the objection, ruled that counsel was attempting to impeach on immaterial issues. We think the trial court's ruling was proper. The question of whether it was the complainant's belt or pants which were unbuckled is so clearly collateral and immaterial that it is not subject to impeachment by proof of prior inconsistent statements. *People v. Solomen*, 261 Ill.App. 585.

■■ Citing *People v. Savage*, 325 Ill. 313, 156 N.E. 310, defendant next contends that the court improperly prohibited Mrs. Gray from testifying to the absence of defendant's reputation for homosexuality. At trial the following colloquy occurred:

"DEFENSE COUNSEL: Have you ever heard from your children from any of your neighbors, that the defendant John Partee had a reputation for being a homosexual?

PROSECUTOR: Objection.

THE COURT: Sustained. Strike it.

DEFENSE COUNSEL: Your Honor, I believe that it would be a showing of good reputation and I believe the law holds that good reputation can be shown by the absence of hearing anything bad.

THE COURT: That is not so. The objection was sustained. If you want to put in good reputation, you may do so but you have not done so. Objection sustained. You are attempting to do it by a negative.

DEFENSE COUNSEL: Do you know the repution of the defendant John Partee in terms of homosexuality or heterosexuality?

[Objection sustained.]"

Defendant, apparently misunderstanding the basis of the trial court's ruling, quotes the following passage from *People v. Savage*, 325 Ill. at 319:

"Good reputation may be shown by the fact that among those of his neighbors who know him best in the community in which he resides no discussion or comment of his reputation or matters bearing thereon has been had, and a competent witness to good reputation may therefore properly base his opinion as to reputation on the fact that he has never heard anything said against the accused."

The basis of the trial court's ruling referred to the lack of a proper foundation. It is generally accepted that evidence of good character offered by an accused may and must relate particularly to that trait of

character which is involved in the crime charged, so that the proof of good character will render it unlikely that he would be guilty of that particular crime. (22A C.J.S. *Crim. Law* § 677(5).) In sex crimes, the traits involved, and as to which the accused may introduce evidence of his good character of reputation, are chastity, morality, and decency. *People v. Klemann*, 383 Ill. 236, 48 N.E.2d 957.

■■ Once a statement of good reputation is introduced into evidence, it may be supported by testimony that the witness has never heard anyone speak against his character generally, or with reference to a particular trait thereof. (*People v. Huffman*, 325 Ill. 334, 156 N.E. 342; *People v. Dunham*, 344 Ill. 268, 176 N.E. 325; *People v. Savage, supra.*) The propriety of such supportive testimony, often termed "negative evidence," is the proposition for which the cases cited by defendant stand. The trial court's use of the term "negative" referred to the competency of the statement of reputation itself. Semantically, homosexuality is not one of the character traits for which one can have a good reputation (See, *People v. Klemann, supra.*), nor may counsel inquire of a negative attribute of character, and infer that its absence is sufficient to lay a proper foundation for good reputation.

■■ Defendant next alleges that under the rationale of *People v. Montgomery*, 47 Ill.2d 510, 268 N.E.2d 695, the court erred in allowing the State to introduce into evidence certified copies of defendant's 1969 convictions for burglary and larceny for the purpose of impeachment. If a defendant takes the witness stand, his credibility may be impeached by proof of a prior conviction for an infamous crime. (*People v. Kirkpatrick*, 413 Ill. 595, 110 N.E.2d 519.) Both burglary and larceny (theft in Illinois) are infamous crimes. Ill. Rev. Stat., ch. 38, par. 124—1.

Defendant's reliance upon *Montgomery* is misplaced. In that case, the Supreme Court held that impeachment of a defendant by the introduction of a prior conviction was a matter to be determined in the discretion of the trial judge. The exercise of that discretion, however, is to be both guided and limited by reference to Rule 609 adopted by the Committee on Rules of Practice and Procedure of the Judicial Conference of the United States. As applied to the present case, the trial court's action was within the bounds of discretion inasmuch as the convictions were neither improper as to subject matter nor too remote in time. (See Rule 609(a) (1), (b) *supra.*) It is argued, however, that the lower court abused its discretion in that the "probative value of the evidence of the crime is substantially outweighed by the danger of unfair prejudice." (Rule 609 (a) (3) *supra.*) We disagree.

■■ In alleging an abuse of discretion within the rationale of *Montgomery*, the force of such contention is diminished when, as in the in-

stant case, the trier of fact is the trial judge rather than a jury. For much of the language of *Montgomery* concerns itself with the suspect effectiveness of limiting instructions informing the jury that the accused's criminal record bears merely on the weight of his testimony, but is not to be considered as evidence of prior crimes. In balancing the probative value against the possibility of such prejudicial unfairness, there is a presumption that the court, when sitting without a jury, considered only competent evidence in reaching its decision. (*People v. Cox*, 22 Ill.2d 534, 177 N.E.2d 211.) Here, the three-year-old convictions for burglary and larceny reflect upon the honesty and veracity of the witness. The defendant has failed to rebut, hypothetically or otherwise, the presumption that the trial court considered the evidence for purposes of impeachment alone. We conclude, therefore, that the trial court was acting well within its discretion.

Defendant next asserts that the trial court erred in refusing to dismiss the indictments because the defendant was not placed on trial within 120 days from the time of his arrest in accordance with Section 103—5 of the Code of Criminal Procedure. (Ill. Rev. Stat., ch. 38, par. 103—5.) Section 103—5(a) provides, *inter alia:* "Every person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he was taken into custody unless delay is occasioned by the defendant * * *." Subsection (d) provides that "Every person not tried in accordance with subsections (a), * * * of this section shall be discharged from custody * * *."

Defendant was placed in custody on October 18, 1971. He presented a discovery motion on January 7, 1972, part of which requested access to any tangible objects that the State intended to use at trial. In response to this request, the answer to the discovery motion, filed January 28, 1972 contained the following notation: "Does not apply." On February 8, 1972, one week prior to the expiration of the 120 day period, the State informed the defense of its intent to use the complainant's undershorts at trial.

On February 11, 1972, defense counsel requested a continuance, but asked that it be attributed to the State for two reasons. First, the State's notice of intent to use physical evidence did not leave defendant adequate time before the end of the term to have an expert examine the tangible evidence. Secondly, one of the defense witnesses had been hospitalized and could not appear in court.

On appeal, the defendant's theory is that when there are two reasons for delay, one due to the State, the other due to the defense, the delay should be attributed to the State because it failed to meet its obligation of promptly bringing defendant to trial.

Although we are not persuaded that the State's action in respect to the physical evidence was violative of its obligation under Section 103—5(a), assuming defendant's characterization, *in arguendo*, the fact that the delay was partly attributable to the defendant is dispositive of the issue.

■■ In considering if the delay in the trial was "occasioned by the defendant" within the meaning of Section 103—5(a), we note the admonition of the Supreme Court stating that the statute "must be liberally construed and its salutary provisions cannot be frittered away by technical evasions." (*People v. Fosdick*, 36 Ill.2d 524, 528, 224 N.E.2d 242.) Accordingly, it is held that where the accused has sought and obtained a continuance, or agrees to a continuance, or in any manner causes delay in trial by his own action, the four-month period is renewed and starts to run again from the date the delay occurred. (*People v. DeStefano*, 64 Ill.App.2d 389, 212 N.E.2d 357.) Viewed in this context, we think that defendant's request for a continuance based, even if only in part, upon his inability to timely produce witnesses, is sufficient to toll the statutory period.

■■ Defendant finally contends that the court erred in convicting defendant of two counts of indecent liberties because the offenses resulted from the same conduct. In support of his contention, defendant cites *People v. Cox*, 53 Ill.2d 101, 291 N.E.2d 1, decided subsequent to the trial below. That case involved a defendant convicted of two counts of indecent liberties with a child, one count involving sexual intercourse, and the other involving deviate sexual conduct in the form of oral-genital conduct. The petitioner argued that "although either act would constitute the offense of indecent liberties with a child, these acts, which occurred almost simultaneously, at the same place with the same child, constituted one offense performed in two of the three ways enumerated in the statute defining the crime, and cannot constitute two separate crimes." The Supreme Court agreed. In the present case, defendant was convicted of two counts of indecent liberties with a child, one involving anal intercourse, and the other involving oral-genital conduct. Because the conduct here constituted a single offense within the meaning of the *Cox* decision, the defendant should only have been convicted and sentenced to one count of indecent liberties with a child. Accordingly, the judgment of conviction and the sentence on the second count of the indictment charging indecent liberties with a child are vacated.

Except for the vacation of the conviction and sentence on Count II, the judgment of the Circuit Court is affirmed.

Affirmed in part and vacated in part.

LEIGHTON and DOWNING, JJ., concur.