THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* KEITH WILLIAMS, Defendant-Appellant.

(No. 60137; ▮▮▮▮▮▮)

First District (5th Division)—November 14, 1975.

James J. Doherty, Public Defender, of Chicago (Ira Churgin, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Raymond J. Prosser, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, defendant was found guilty of murder and attempt (armed robbery) in violation of sections 9—1 and 8—4 of the

Criminal Code (Ill. Rev. Stat. 1973, ch. 38, par. 9—1 and par. 8—4) and was sentenced to a term of 25 to 45 years for murder and 5 to 10 years for attempt. On appeal he contends that: (1) he was not proved guilty beyond a reasonable doubt; (2) he was denied a fair trial by the State's delay in producing certain evidence, by the State's closing argument, and by the court's failure to tender an instruction to the jury; and (3) his conviction for attempt must be reversed because it arose from the same conduct as his murder conviction.

At trial, the following evidence pertinent to this appeal was adduced.

For the State.

*Thomas Gaynor*

He is a Chicago police officer with 4½ years' experience. At 5:40 P.M. on December 30, 1970, he and his partner, Officer Karaus, responding to a radio call arrived at 6440 South Greenwood where they discovered an Abernathy cab which had collided with a parked Rambler on the west side of the street. The driver was slumped over the steering wheel. The driver's side window of the cab was shattered but intact. There were five or six holes in the front windshield. He saw no one in the street. Pieces of glass were found inside the vehicle and on the street. At Woodlawn Hospital he inventoried $7.95 found in the driver's pockets.

*Claude Wiley*

He has been a detective on the Chicago Police Department for the last 13 of his 18 years service. He corroborated Officer Gaynor's testimony regarding the location and the vehicles involved. The driver's body had been removed before he arrived at the scene. The taximeter and the motor were still running. He found two shotgun casings on the street near the cab. He examined the deceased's body at Woodlawn Hospital. There were wounds in the left shoulder area and a slight mark on the bridge of deceased's nose.

*Tyrone Robinson*

In the early evening hours of December 30, 1970, as he and Nathaniel Nelson were walking south in the 6400 block of Greenwood on the east side of the street, he saw Ulysses Murphy walking toward them. Murphy turned around before he reached them. He then saw Murphy, Joe Thomas, Larry Jones, and defendant in a gangway. When he was about ten feet away from those boys, he saw defendant holding a rifle in his right hand. As he and Nelson continued walking, he heard Murphy say: "Let's get this cab." He then saw Murphy walk into the street and flag down a cab. While he was looking through a small window in the hallway of a building about four buildings south of the gangway, he saw defendant, standing at the curb, fire the first of several shots at a cab. The first shot pierced the windshield of the cab and the cab hit another

car. He saw defendant fire other shots at the cab, one into the side window of the cab. He testified that there were no passengers in the cab at the time of the shooting.

On cross-examination, he admitted making numerous inconsistent statements while under oath at previous trials. Among these were statements that defendant did *not* fire the first shot, that there was a female passenger in the car at the time, that he was on the street when the shots were fired, not in a hallway, that he did not know who made the statement to shoot at the cab, that he was not sure which hand held the rifle, that he previously said defendant was holding it in his left hand, that he had seen five or more boys in the gangway rather than the four he had just named, and that Murphy had passed him on the street, then turned and followed him.

*Nathaniel Nelson*

When the State was unwilling to vouch for his credibility the court made him its witness. He was walking south on Greenwood with Robinson on December 30, 1970. He saw defendant, Murphy, Joe Thomas, and Larry Jones in a gangway. Defendant was not doing anything. He had known Keith Williams for about 18 months prior to December 30, 1970. He heard Murphy say "Let's get this cab." and then heard a shot when he was about 20 feet south of the gangway. When he heard the first shot he started running down Greenwood. He heard three shots in all and saw defendant and Larry Jones standing between two parked cars as he ran. He saw the cab collide with a parked car. He could not see or was unable to remember who fired the shots.

*Larry Jones*

Following a previous bench trial, he was convicted of the murder and attempt (armed robbery) of Ernest Bradley and his conviction was affirmed by the Illinois Appellate Court. He agreed to testify truthfully in the instant case only after the Cook County State's Attorney's Office promised: (1) to secure executive clemency for him and a reduction of his sentence to a term of three years to three years and a day, (2) to recommend to the Pardon and Parole Board that he be released immediately, and (3) to house him in the witness' quarters during the proceedings. Moreover, he admitted that he had aided and abetted the commission of the crime of which he was convicted.

He testified that on December 30, 1970, he, Joe Thomas, Ulysses Murphy, and defendant went to a store at 65th and University in Chicago and agreed to go rob someone. They then went to his apartment at 1112 East 65th Street where he lived with defendant and defendant got a shotgun. All four then went to the gangway off Greenwood. Someone said: "Let's get this cab." Murphy then flagged down a cab and

defendant, who had walked to the curb, fired a shot. Jones said he did not actually see the cab. He further testified that he and Thomas stayed in the gangway. He stated that Robinson and Nelson were not involved in the crime and had merely walked past the gangway.

On cross-examination, he was impeached by numerous prior inconsistent statements. He admitted lying previously when he had stated that he saw the cab and that there was a passenger inside it. He admitted saying that he had walked toward the cab, and that he had not stayed in the gangway. He lied on a prior occasion when he said both Robinson and Nelson were standing beside defendant at the time of the shooting. Instead, he said that they were not even at the scene at the time of the shooting.

He further admitted that at the time of his arrest, he went with the police to find defendant only because he wanted to go home and because they had threatened to give him a prison term of 50 to 100 years if he did not help them find defendant. He was asked the following question regarding his testimony in the instant matter:

"If you can save your skin and put it on Keith Williams, you wouldn't hesitate, would you?"

Jones answered: "No."

During the State's presentation of evidence, the State asked leave of the court to amend its answer to defendant's discovery motion. The court allowed the State to amend, and also turned over the State's entire file of police reports to defendant. After reviewing these reports, defense counsel discovered a missing middle page from a police report which had not been previously turned over to defendant pursuant to his pretrial discovery motion. That missing page gave the names and addresses of two witnesses, Donald and William Kelso, who were around the corner from the scene of the shooting. The record discloses that the State's pretrial list of possible witnesses, which had been turned over to defendant, included the name "William Kelson" and that Kelso's home address appeared directly below the misspelled name.

The report indicated that the Kelsos heard the shots being fired and saw two men come around the corner. William Kelso stated that he knew one of the two men, and would be able to recognize the other if seen again. On the next page of the police report, which had been turned over to defendant, a "William" identified the man he recognized as "Monk." It was stipulated at trial that "Monk" was Tyrone Robinson.

Thereupon, the court adjourned the cause until the following day at noon to allow the defendant to investigate this newly discovered matter. The next day defense counsel informed the court that he was unable to locate the witnesses. The court heard additional testimony and adjourned

for the weekend. On Monday, after a continuing search for the witnesses proved unsuccessful, defendant filed a motion to dismiss the indictments against him. The court denied that motion.

Following this evidence, the jury found defendant guilty of murder and attempt (armed robbery).

OPINION

Defendant contends that he was not proved guilty beyond a reasonable doubt. Ordinarily, questions of credibility of witnesses are left to the trier of fact and a reviewing court will not reverse its findings. The law is clear, however, that this court must reverse a conviction based upon evidence which does not meet the standard of proof beyond a reasonable doubt. (*People v. Reese*, 34 Ill.2d 77, 213 N.E.2d 526; *People v. Sheppard*, 402 Ill. 347, 83 N.E.2d 587.) We believe this case presents such a situation. Here, the numerous inconsistencies and the admitted bias of the State's key witnesses, Robinson and Jones, goes to the very root of the State's case.

Everything Robinson testified about in the instant case he had stated differently on one or more prior occasions. Most importantly, he had previously sworn that he did *not* see defendant fire the first shot through the cab's windshield. While his contradictory testimony on the persons involved, their location, and their actions appears insignificant when viewed individually, they describe a completely different occurrence when viewed as a whole. These contradictory accounts suggest fabrication, not merely a loss of memory. Moreover, Nathaniel Nelson, his companion, did not corroborate his story regarding defendant's participation in the crime.

Robinson had previously been accused of participating in the crime by Larry Jones. Robinson admitted on cross-examination that he told the police what he had witnessed in order to clear himself of suspicion. The testimony of a possible accomplice must be viewed with great caution. (See *People v. Hermens*, 5 Ill.2d 277, 125 N.E.2d 500.) When viewed in this light Robinson's testimony is all the more unbelievable.

In addition to Robinson's unbelievable testimony, the State offered the testimony of Larry Jones. Jones had already been convicted of the instant crime, and properly so; but Jones did not like prison and admitted that he would do anything to get out. In return for his freedom, Jones had to testify "truthfully" against defendant. His testimony was marked by contradictions and by the admission of prior perjuries. Moreover, although Nelson's testimony put Jones beside defendant at about the time of the shooting, he denied ever leaving the gangway, and he thereby was caught in another inconsistency. Here, the inherent weakness found in

the testimony of an accomplice, as stated in *People v. Hermens*, 5 Ill.2d 277, 125 N.E.2d 500, is all the more obvious in Jones's testimony and further undermines the State's evidence.

Finally, although we do not reach the merits of defendant's second contention, we note in passing that the statements of William and Donald Kelso, which were not given to the defendant, would, if believed, raise serious doubts about Robinson's credibility and about the occurrence itself.

Having thoroughly reviewed the record in the instant case, we hold that the State did not prove defendant guilty beyond a reasonable doubt.

The judgment of the trial court is reversed.

Reversed.

BARRETT, P. J., and DRUCKER, J., concur.