THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOHNNIE E. SHIELDS, Defendant-Appellant.

Third District   No. 75-422

Opinion filed December 13, 1977.

Robert Agostinelli, of State Appellate Defender's Office, of Ottawa, and Mary Robinson, of State Appellate Defender's Office, of Elgin, for appellant.

Michael M. Mihm, State's Attorney, of Peoria (James E. Hinterlong and Robert M. Hansen, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE BARRY delivered the opinion of the court:

The defendant, Johnnie Shields, was indicted for attempt murder because, in the language of the indictment, he, with the intent to commit murder, performed a substantial step toward the commission of that

offense, in that he shot Marian Bradley "knowing that such act created a strong probability of death or great bodily harm," and for aggravated battery based on the same act. This appeal, by the defendant, does not challenge the indictment. After his trial, the jury found the defendant guilty of both counts of the indictment, but the trial court entered judgment only on the attempt murder count and sentenced the defendant to a term of imprisonment of not less than 7 nor more than 21 years.

The evidence presented at trial showed that at about 1 o'clock in the morning on New Year's Day, 1975, Shields and the woman he lived with, Samella Matchum, returned home from a party. They were accompanied by two friends, Andrew and Jean Nelson. Upon seeing their neighbor's door ajar, John and Samella invited Marian Bradley and her two daughters, Sharon and Carolyn Myartt, to their place for a drink. Sharon left after a few minutes, but the rest of them sat around Shields' living room, drinking and listening to records. An hour or two later, Marian's son, Robert Wilson, arrived with a friend. The friend left within a few minutes, but Wilson stayed and began drinking with the others.

The evidence as to what occurred subsequently is contradictory. Marian Bradley testified that her son, Robert, arrived at Shields' apartment at about 3 a.m. in a highly intoxicated condition. Wilson was stumbling into furniture and generally causing a disturbance, so about 15 minutes after he arrived, she told him either to sit down or come home with her. He refused and Marian left and went to her apartment to fix some breakfast. As she was cooking, she heard loud noises, exclaimed to herself, "Oh my God, Bobby's over there fighting," and proceeded back to Shields' apartment to see what was going on. In leaving, she called back to her younger son to call the police. When she arrived at the next door apartment, Shields had her son, Robert, pinned on the floor. Marian asked him not to hit Bobby again and took some money from Wilson's shoe to pay for the kitchen table he had broken. About this time the police arrived and asked Marian what she wanted them to do. She replied that there was nothing they could do, and that she would take her son home and sober him up. Carolyn helped her grab Bobby by the arms and legs and together they dragged him next door. Shortly after she got Bobby home, Marian heard John Shields at her back door screaming, "I'm going to kill you." At that, Bobby ran out of the door of the apartment and when he saw that Shields had a gun, began running around a car parked in Shields' back yard. The defendant chased Bobby around the car four or five times, trying to aim the gun at him. Marian ran out of the apartment shouting to Shields, "Don't shoot him." Carolyn followed her out of the apartment and both were standing at or near the sidewalk leading out to the alley. Marian jumped in front of Bobby to protect him and Shields told her to move or he would blow her brains out. At some point, Marian

and both of her children grabbed the gun and had it down facing the ground. Shields pushed them back and shot. When the shot was fired, Wilson was standing directly behind his mother and Carolyn was a little behind and a little to her left, but within reaching distance. However, the shotgun was pointed directly at the victim, Marian Bradley.

Carolyn Myartt, Mrs. Bradley's daughter, testified that sometime after their mother left, Carolyn attempted to get Bobby to go home. He became angry and hit her, pulled her hair and knocked her under the sink in Shields' kitchen. She asked Shields to help her and he attempted to subdue Bobby. In the course of the struggle, the kitchen table was broken. Carolyn testified that the fight between her brother and the defendant got "worse and worse" and that Shields had a gun on Bobby, so she ran to get her mother. When she returned with her mother, the defendant was still standing over Bobby with a gun, but removed it at Marian's insistence. The police arrived and asked Marian what they should do. She told them that she would take Bobby home, and without coming into the apartment, they left, and Carolyn and her mother then dragged Bobby next door. Within a few minutes, Shields came over and was hitting on the back door of Bradley's apartment. Just before the defendant reached the apartment, Carolyn heard him say, "I want to get Bobby's ass." Bobby jumped up and ran out the door. Carolyn and her mother were pulled onto the porch in attempting to restrain him and all three began struggling with the defendant over the gun. The scuffle proceeded from the porch into the yard, but Carolyn lagged behind since she was afraid of guns. At one point during the scuffle, Bobby, who was standing directly behind Marian, got his hand on the gun and Shields pulled back. Carolyn said, "That's my mother, don't shoot my mother." Shields said, "I'll kill all you motherfuckers," and stood back and shot. Carolyn testified that Shields was 10 to 15 feet away from Marian when he shot, but later stated that he was just far enough away so that Bobby, who was standing behind Marian, could not grab the gun. Carolyn also testified that she was nowhere near her mother and brother when the gun discharged and instead was standing behind John Shields. When the shotgun was fired, the defendant held it between his hip and shoulder. After the shot was fired, Bobby threw himself across his mother, at which time the defendant said something like, "Get up. It's your turn now."

Robert Wilson testified that he did not recall fighting with his sister, Carolyn, nor the police coming to the apartment to break up the fight between Shields and himself. However, he did remember that when he fought with the defendant, Shields brought out his shotgun and held it on him. He testified that he walked to his mother's apartment after leaving Shields' but then stated that he did not recall how he got there. He next remembered Shields coming to Marian's back door with the shotgun and

shouting that he was going to kill him. Bobby opened the door and his mother stepped out in front of him. Shields was standing in the alley and Marian moved into the yard, with Wilson standing behind her on the porch and in the doorway of the apartment. Marian told the defendant that he was not going to shoot her son and Shields responded, "Well, I'll kill both of you," and shot. Wilson never had his hand on the gun or struggled with the defendant over the gun until after the shot was fired. He also never moved from the porch or doorway during that time. He did not remember where Carolyn was during the shooting, whether inside or outside the apartment, and did not recall seeing his mother and sister grappling with the defendant over the gun. However, he testified that when the shot was fired, the gun was pointed at his mother.

Samella Matchum testified that, after Wilson arrived at their apartment he had a brief argument with Carolyn over money but then calmed down. Sometime later, the Nelson's asked Shields to take them home and when the defendant returned, Marian left, saying she would fix breakfast. Shields told Bobby and Carolyn to leave because he wanted to go to bed, but Bobby began fighting with Carolyn when she tried to get him to leave. Marian heard the noise of the fight, returned, and asked Shields to knock Bobby out so that she could get him home. He declined, but did wrestle with Bobby until he had him pinned to the floor. Shields did not have a gun at that time. The police arrived and came into the apartment. After the police left, more fighting in the apartment ensued, during which Samella noticed that Shields had been bitten. Bobby was finally subdued to the point that Marian and Carolyn could get him home. Marian then returned with $20 to help pay for the table Bobby had broken.

Samella then testified that Shields got his gun and, while she watched from the door, went over to Marian's apartment. When he got to the porch, Carolyn and Bobby rushed out at him. They grabbed at the gun, and the three of them (Shields, Bobby and Carolyn) were all bunched together in the yard, wrestling for the gun. Marian came out of the door, stepped into the yard toward them, and the gun went off wounding her on the left side.

Shields testified that sometime after Robert Wilson arrived, Carolyn and her brother began to quarrel over money. They were arguing fairly loudly, and Marian left to get a nerve pill. Bobby and Carolyn were fighting seriously when Marian returned, and she asked him to help her and to knock Bobby out. He attempted to restrain Wilson and had him subdued once, but when he let him up, Bobby immediately began swinging at Carolyn again. He finally tripped him so that he fell to the floor, and began to wrestle with him, in the course of which Bobby bit him several times on the chest. Marian and Carolyn were finally able to get him home. The police appeared during this time, but Shields was not

aware of their presence. He was still angry after Wilson left, and decided to give him a good scare. Shields got his shotgun, forgetting that he had not unloaded it when he last returned from hunting and headed towards the Bradley apartment. In fact, he admitted that he never unloaded the gun when he returned from hunting. When he got to Marian's back door, Bobby and Carolyn rushed out and pinned him against a tree. A struggle over the gun ensued. Shields stated that he was aware of struggling only with Bobby and Carolyn and that he never actually saw Marian at all until the gun went off. Even at that point he did not realize that someone had been shot, and it was not until he had walked some distance away and turned around that he saw Marian lying in the yard. He testified, however, that he had his finger on the trigger of the shotgun before the shot was fired.

Officer Robert Watson testified at trial that he and Officer Krummel responded to a fight call at 7:20 a.m. on January 1, 1975. When they arrived at Shields' apartment, they observed a fight in progress in the kitchen. Shields had Bobby lying on his back and pinned to the floor. About the time they entered the apartment, Marian also came in. She told the officers that she could handle things and would take Bobby back to her apartment. Officer Watson stated that Shields had been bitten on the chest. He further stated that there was no weapon present at that time. Marian took Bobby home, and the officers left.

Fifteen or 20 minutes later they received a call to the same location. When they arrived, there was a crowd around the car in the alley and the defendant was standing across the street with a shotgun in his hands. Both police officers drew their revolvers and told Shields to drop the weapon. He did not do so immediately, but did so after they repeated the order and told him they would shoot if he did not drop the gun. Marian Bradley was taken to the hospital in an ambulance and Shields was taken into custody.

The court instructed the jury on the offenses of attempt murder, aggravated battery and, at the request of the defense, reckless conduct. The instruction given for attempt murder pointed out that the State was required to prove that the defendant took a substantial step toward the commission of the offense of murder with the intent to commit that offense. Murder was defined in People's instruction number 10, which stated: "A person commits the crime of murder who kills an individual if, in performing the acts which cause the death, he knows that such acts create a strong probability of death or great bodily harm to the individual."

The jury returned verdicts finding defendant guilty of attempt murder, aggravated battery in two counts and reckless conduct. A judgment of conviction was entered on the attempt murder charge only and on

November 13, 1975, Shields was sentenced to a term of not less than 7 nor more than 21 years imprisonment.

The defendant raises three issues for consideration in this appeal. First, the defendant contends that he was not proven guilty beyond a reasonable doubt because the testimony of all the witnesses concerning the incident was not consistent and failed to disprove defendant's hypothesis of innocence. In addition to raising the issue, the defendant requests that this court reduce the conviction to one for reckless conduct.

■■ The law of Illinois is clear that a reviewing court cannot substitute its judgment for that of the trier of fact on questions involving either the credibility of the witnesses or the weight of the evidence. (*People v. Jones* (1975), 60 Ill. 2d 300, 325 N.E.2d 601.) Although the defendant has cited two cases to support the proposition that a multitude of inconsistencies and direct contradictions in the witnesses' accounts will invalidate a conviction, both cases are distinguishable. In *People v. Williams* (1st Dist. 1975), 34 Ill. App. 3d 136, 339 N.E.2d 314, the inconsistencies relied upon were inconsistencies with the witnesses' prior statements. In addition, that court found that the two State's witnesses each had a motive for lying, one to clear himself from implication in the crime and other had a bargain with the State to keep from going to prison. In *People v. Hister* (1975), 60 Ill. 2d 567, 328 N.E.2d 531, the inconsistencies included the description of the offenders, the clothes they wore, the number of offenders and the type of automobile they were driving. It may be that confusion among the witnesses as to the identity of the offender is insufficient to support a conviction of any particular defendant. But that is not the case at bar. The only discrepancy here is as to what occurred. In essence, the victim and her family give one story while the defendant and his woman provided another. Therefore, we refuse to impinge on the jury's function of determining the credibility of the witnesses.

The second issue raised by the defendant involves the instructions to the jury. Again, the defendant has requested that this court reduce the conviction of the defendant. However, the reduction requested in this issue is to aggravated battery.

The defendant argues that since attempt is a specific intent offense, the jury should have been instructed that the defendant must have had a specific intent to kill. The instructions given concerning attempt required the jury to find that the defendant performed an act constituting a substantial step toward committing the crime of murder, with the accompanying intent to commit the crime of murder. (IPI Criminal No. 6.05.) But the defendant specifically objects to the instruction defining murder:

"A person commits the crime of murder who kills an individual if

in performing the acts which cause death, he knows that such acts create a strong probability of death or great bodily harm."

■■ It would, of course, have been error for the trial court to instruct the jury on a definition of murder involving the felony murder rule, for there can logically be no such crime as attempt felony murder. *People v. Viser* (1975), 62 Ill. 2d 568, 343 N.E.2d 903.

■■ In Illinois, "[a] person commits an attempt when, with intent to commit a specific offense, he does any act which constitutes a substantial step toward the commission of that offense." (Ill. Rev. Stat. 1975, ch. 38, par. 8—4.) In this case, the specific offense involved is murder. Since murder is a form of homicide, the requisite specific intent for a person to be convicted of attempt murder is an intent to cause the death of another human being. Although the offense of murder may be committed without an accompanying intent to kill, the offense of attempt murder cannot. This is the general rule in the United States (*Merritt v. Commonwealth* (1935), 164 Va. 653, 180 S.E. 395), and in Great Britain (*Rex v. Whybrow* (1951), 35 Crim. App. 141). See also R. Perkins, Criminal Law 574 (2d ed. 1969); W. R. LaFave & A. W. Scott, Jr., Handbook on Criminal Law 428-29 (1972).

The law of Illinois has also required that a conviction for attempt murder be predicated on a specific intent to kill. (*People v. Davis* (4th Dist. 1972), 6 Ill. App. 3d 622, 286 N.E.2d 8.) Recently an Illinois appellate court concluded that, for an indictment charging attempt murder to be sufficient, the defendant must be charged "with intent to kill an individual, with knowledge that his acts would cause death to an individual, or with knowledge that his acts created a strong probability of death to an individual." (*People v. Muir* (2d Dist. 1976), 38 Ill. App. 3d 1051, 1053, 349 N.E.2d 423, 426.) That *Muir* decision held that it is reversible error for an indictment for attempt murder to incorporate the mental state set out in the murder statute, "[knowing] that such acts created a strong probability of * * * great bodily harm * * *." This holding was extended in *People v. Trinkle* (4th Dist. 1976), 40 Ill. App. 3d 730, 353 N.E.2d 18, to apply to jury instructions as well as indictments.

However, the Illinois Supreme Court reversed the appellate court in *Muir* and, in doing so, implied that *Trinkle* would also be reversed. (*People v. Muir* (1977), 67 Ill. 2d 86, 365 N.E.2d 332.) In *Muir*, the supreme court decided that a person commits attempt murder when, with the specific intent to commit murder, he does an act which he knows could cause death or great bodily harm to another. The mental state of knowing that an act may cause great bodily harm was raised to the level of intending to kill because the law presumed a person intends the natural and probable consequences of his voluntary act. This reasoning is the basis for finding a person guilty of murder who voluntarily does an act

knowing it could result in great bodily harm to another and death to another person results from the act.

Nevertheless, in deciding *Trinkle*, the Illinois Supreme Court reversed itself. (*People v. Trinkle* (1977), 68 Ill. 2d 198, 369 N.E.2d 888.) In affirming the holding of the Appellate Court for the Fourth District, the Illinois Supreme Court specifically adopted the proposition that the intent to cause death must be alleged and proven to sustain a conviction for attempt murder.

■■ Since *Trinkle* involved precisely the same instruction as is objected to in the instant case and since *Trinkle* is the more recent pronouncement on the subject, the Supreme Court's decision in *Trinkle* controls our decision in this case. (*People v. Roberts* (4th Dist. 1977), ⎯ Ill. App. 3d ⎯, ⎯ N.E.2d ⎯.) Therefore, we find the trial court erred in giving the complained of instruction.

Because our decision in this case requires a reversal and remandment for a new trial, we need not address the issue of whether it was improper for the trial court to impose a 7-year minimum sentence. Accordingly, the judgment of the Circuit Court of Peoria County is reversed and the cause is remanded for a new trial not inconsistent with this opinion.

Reversed and remanded.

ALLOY, P. J., and STENGEL, J., concur.