THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
WILLIAM S. CALLINAN, Defendant-Appellant.

Third District   No. 75-156

Opinion filed November 24, 1976.

Robert Agostinelli and Richard Steck, both of State Appellate Defender's Office, of Ottawa, for appellant.

William J. Scott, Attorney General, of Chicago (Donald Hubert, Assistant Attorney General, of counsel), for the People.

Mr. PRESIDING JUSTICE ALLOY delivered the opinion of the court:

Defendant William S. Callinan appeals from a judgment of conviction of murder, based on a jury verdict, which found the 51-year-old William Callinan guilty of the murder of a 14-year-old Bureau County girl. The chief witness for the State was defendant's 15-year-old son, Timothy Callinan, who testified that he was with the defendant, his father, on the evening of April 7, 1974, when defendant William Callinan strangled Tracy Sapp, aided by Timothy. Defendant took the stand and denied the testimony of his son, but asserted instead that on the evening in question, he and Timothy first went to a tavern, and then spent the remainder of the evening chasing some "hippies" and attempting to get their own disabled car back to their home.

On the basis of the record, it is first contended by defendant on appeal that the testimony of Timothy Callinan, being that of an accomplice who was granted transactional immunity in exchange for his testimony, must be viewed with great caution and suspicion and, in view of other evidence, is insufficient to sustain a conviction.

From the record it is apparent that a total of 36 witnesses testified at the trial, a number of them called by both the prosecution and the defense. The principal testimony, however, was that of Timothy Callinan and that of defendant, William Callinan.

Timothy Callinan testified that he was an eyewitness and an accomplice to the murder, by his father, of Tracy Sapp. Timothy, who was 15 years of age, testified that he arrived in Bureau County on April 5, 1974, and first met Tracy Sapp the following day. Tracy spent a large part of the days of April 6 and 7 at the Callinan residence. It appears that she was a friend of Tim's brother, Jim, who testified on behalf of defendant that he had intercourse with Tracy several times.

On the evening of April 7, shortly after Tracy Sapp had left the Callinan residence, Timothy and his father, defendant William Callinan, left in the family station wagon. Timothy said they saw Tracy on the road and, since it was cold, stopped and asked her if she wanted a ride. She accepted the ride and they put her bicycle in the back of the car. Tracy then got into the front seat, sitting between defendant, who was driving, and Timothy. They first drove to a filling station in Princeton.

Tim testified further that defendant asked Tracy if she would like to see a farmhouse he intended to buy, and when she agreed, he made her promise not to tell his wife, as it was supposed to be a surprise. According to Timothy, the next unusual thing he noticed was that his father was

fondling Tracy's breast. He testified that Tracy made no objection, but appeared shy. She eventually removed her coat, and then her shirt. After some further fondling, defendant reached to the dashboard of the car, picked up a knife, put the blade underneath the girl's bra and pulled forward, cutting the bra in the middle. Tim said the girl then pulled back and looked ashamed, but defendant continued fondling her. During most of this time, Tim said, he sat staring out the window. Tim testified that while all of this was going on defendant continued to drive the car with one hand, traveling at about 20 miles per hour, or less. Defendant said something to the girl, and she unbuttoned and partially unzipped her pants. Defendant unzipped them the rest of the way. Tracy said "no," but defendant did not stop, but ripped part of her panties off.

Tim said that the car was finally driven to an abandoned farmhouse by his father and defendant ordered Timothy out of the car telling him not to return until defendant sounded the horn. After about 5 minutes, Timothy became very cold, since the day was cold, and returned to the car. He saw Tracy nude in the front seat, performing an oral sex act on the defendant. He got into the back seat to warm up, but about half a minute later he was ordered out by his father and told not to return until the father sounded the horn. Eventually, Timothy said he heard the horn honk and returned to car. He then saw Tracy lying nude in the back seat, apparently unconscious. Timothy asked his father what was wrong with the girl and defendant replied, "I knocked her off." The boy testified he said "sure." They left the farmhouse and began driving. Later, Timothy again asked defendant what was wrong with the girl, and defendant replied, "I told you once, I knocked her off." Again, Timothy replied "sure."

While they were driving, the girl moaned. Defendant then pulled into another abandoned farmhouse and parked the car. He and Timothy then pulled the girl into the front seat. Timothy heard her mumble, "If you kill me, leave my bike where somebody can find it." Defendant then put Tracy in an armhold described as a "Japanese stranglehold," which defendant had previously told the boy would kill instantly. After about a minute and a half, defendant took the knife off the dashboard and struck Tracy on the forehead with the handle. She began to bleed. Defendant then held her in the stranglehold again for a minute and a half, checked her pulse and found that she was not dead. Defendant then took a three foot length of rope from underneath the seat of the car, looped it around the girl's neck, and pulled for about a minute. During this time Timothy said he did and and said nothing. Defendant again checked Tracy's pulse and said "not dead," pulled on the rope again and said "Come on, die, bitch." Timothy then grabbed one end of the rope with both hands and defendant and Timothy pulled together for about four minutes until

Tracy stiffened up and urinated on the seat. Defendant then checked Tracy's pulse and said, "she's dead."

They then drove to a bridge over a culvert where they dumped the girl's body. It came to rest in a position in which the authorities later found it. Defendant and Timothy then drove away, and while the car was moving defendant told Timothy to throw some beer cans and pieces of rope from the car, which he did. Timothy later identified the area where he threw the rope out, but no rope was ever recovered. At a second bridge, the two threw the girl's bicycle and her clothing into the water, according to Timothy. While driving home, Timothy asked his father why he had killed Tracy, and defendant replied that she would have told on him for having sex with her. Timothy then testified that defendant told him a story to tell police about chasing "hippies" on motorcycles to get their license numbers, and of having car trouble. Defendant also told Tim, "Now you have killed your first girl," and told him that if he told anyone about it both of them would be put in jail.

Defendant took the stand in his own behalf and denied the story told by his son. He stated that he had been told that some "hippies" had been looking for him because he had turned in his older son for being AWOL from the service. He testified that on the night of April 7, 1974, he left the house with Timothy and went to a tavern. After he left the tavern he saw two motorcycles turn down the Interstate highway, and he followed them. He testified that he was looking for some people who lived in the same apartment building as his son, Mike, whom he caused to be arrested for being AWOL. He testified that he tried to overtake the bikes, but failed. The car then started making a noise, defendant said, and defendant thought it might throw a rod. He left the Interstate at the first exit and parked the car. After the car had cooled down, he added some oil which he testified he always carried with him. He then drove on the back roads at about 15 miles per hour, stopping occasionally to add more oil. He and Tim arrived home at approximately 1 a.m.

It was brought out in the cross-examination of Timothy that he first told the police the same story his father had told him to tell about chasing "hippies" and that he and his brother had taken the father's automobile to Cincinnati where they took the license plate and other identification off the car and left it. He also stated that he was told that if he told the truth, he would be released of any charges involved in the crime against Tracy Sapp. He said he then told the truth. It also appeared from the record that family members of defendant had taken Tim and the others with him away from the community in what was thought to be an effort to avoid having him testify.

There were a number of other witnesses who testified concerning

pathology and the probable length of time between the death of the girl and the time the body was found on April 15, 1974. Two of the experts indicated that the body was dead more than 18 hours. One testified that any time between 3 and 10 days was equally possible, judging from the condition of the body and the other indicated only that the body had been dead at least 18 hours. Defendant's expert witness testified that it was his opinion that the body could not have been dead for more than 4 days before the autopsy. The autopsy was conducted on April 15, 8 days after Tim Callinan testified that the girl was killed. There was evidence that the climatic conditions where the body was located during the period of time, stood roughly at a temperature similar to the temperature maintained in refrigerated storage with bodies preparatory to autopsy. There was also evidence that the body was relatively shielded from the sun during that period of time.

Other details of testimony of the witnesses for the prosecution simply tended, if believed by the jury, to corroborate the story told by Timothy, or, as to some of the defense witnesses, to contradict Timothy's testimony and corroborate defendant's testimony. None of the witnesses, however, could testify to the whereabouts of defendant and Tracy Sapp, during the greater part of the evening or the night of April 7.

During the direct examination of the defendant, defense counsel brought out that defendant had pleaded guilty in 1968 to a charge of conspiracy to commit perjury in the United States District Court for the District of Vermont. On cross-examination, the prosecuting attorney delved into that conviction and the circumstances surrounding it. The prosecutor brought out the name of the co-conspirator, and further brought out that not only did the defendant conspire to commit perjury, but that defendant did in fact commit perjury at that time. Defendant admitted he did not tell the truth at that time. One question which was asked by the State in response to an assertion by defendant that he was telling the truth, was: "Is this the same kind of truth you told on behalf of the individual involved in the conspiracy in Vermont?" Callinan answered, "No, sir, this is the truth. It has to be. This isn't the same kind of case." Defendant contended, he was telling the truth in the instant case. Defendant asserted that he lied for the individual in Vermont because he had received threatening letters suggesting that if he did not lie, harm would come to his children. He also stated that one of his children had been kidnapped from his apartment building shortly before he had gone to court. On re-cross-examination, the prosecutor used defendant's redirect testimony to pursue the question further and brought out that at no time was defendant's excuse, relating to threats to his family, brought to the attention of the trial judge. Defendant did, however, state that he told his lawyer about those threats.

During the closing argument, the prosecutor made the following remarks:

> "I am not going to tell you personal opinion about this case, as Mr. Perona saw fit to do, at the very end of his argument, because my presence here, and Mr. Gildea's presence here, for over a month, is silent witness to what our belief in this case is. It is silent witness to the fact that we believe in this case, that we believe in Tim Callinan, and we think a fourteen-year-old girl is important enough to go to court about."

No objection was made by defendant to those remarks, although a contention is made on appeal in this court for reversal with respect to the remarks.

Following instructions to the jury and the jury deliberations, the jury returned a verdict of guilty of murder as against defendant Callinan. After a presentence investigation, the court sentenced defendant to a term of imprisonment of not less than 100 nor more than 200 years.

Defendant contends on appeal, that the testimony of Tim Callinan, being that of an accomplice, must be viewed with caution and suspicion and that, in light of the other evidence, the testimony of Tim Callinan is insufficient to sustain a conviction. Defendant also contends that because Tim had been given transactional immunity in exchange for his testimony, his testimony must be viewed with even greater caution and suspicion.

■■■ From our review of the record, we do not believe that this contention is well grounded. While it is true that testimony of a witness who is an accomplice is to be viewed with suspicion and is to be viewed by the jury with caution (*People v. Hermens* (1955), 5 Ill. 2d 277, 125 N.E.2d 500; *People v. Williams* (1st Dist. 1975), 34 Ill. App. 3d 136, 339 N.E.2d 314; IPI Criminal 3.17 (1968)), it is also clear that such evidence, if it is enough to convince the jury beyond a reasonable doubt, is sufficient to sustain a conviction. (*People v. Hansen* (1963), 28 Ill. 2d 322, 192 N.E.2d 359, *cert. denied*, 376 U.S. 910, 11 L. Ed. 2d 608, 84 S. Ct. 665. We note, in the instant case, that the girl's body and her bicycle were found in the places the young witness had testified that he and the defendant had left them. The testimony of the experts as to the cause of death was consistent with the story told by Timothy Callinan as to the girl being strangled and hit with a knife in the forehead. Although there was some evidence to the contrary, the evidence was clearly sufficient for the jury to conclude that Tracy Sapp was never seen alive after the time Timothy Callinan testified that she was murdered, and the testimony of two of the three expert witnesses was consistent with the death of the girl occurring at the time indicated by Tim Callinan. While there were some inconsistencies presented by the testimony, the jury as the trier of fact

made the choice of what evidence to believe, and the facts in the record are clearly sufficient, if believed by the jury, to support the verdict reached. This determination was strictly an issue for determination by the jury, and was resolved by the jury.

■■ Defendant contends that reversible error was committed when the State was allowed, over objection, to dwell upon and emphasize defendant's prior criminal conviction. It is well settled that when a criminal defendant takes the stand in his own behalf, the trial court must determine whether the admission of prior convictions for the purpose of impeachment is outweighed by the likelihood of prejudice to defendant (*People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695). When the likelihood of prejudice is not great, the State may inquire into misconduct which has the effect of impeaching defendant's credibility. (Ill. Rev. Stat. 1975, ch. 38, par. 155—1; *People v. Partee* (1974), 17 Ill. App. 3d 166, 308 N.E.2d 18.) When, however, the probative value of evidence of prior crimes is greatly outweighed by the prejudice to the accused from its admission, the use of such evidence by the State may rise to the posture of fundamental unfairness (*United States ex rel. Bibbs v. Twomey* (7th Cir. 1974), 506 F.2d 1220).

■■ In the instant case, however, the defense does not contend that the introduction of the evidence of the prior conviction was prejudicial. As a matter of fact, it was the defense who first introduced the fact of the prior conviction. Here the defense complains that the State went beyond the usual steps of bringing out the type of crime and the date of the conviction to the attention of the jury. The prosecutor in his cross-examination of defendant delved into details of the crime and activities of the defendant surrounding the crime. While normally the use of prior convictions to impeach a defendant should be limited to the fact of conviction and circumstances and details surrounding the prior crime should not be heard, the objective is to prevent the defendant in a current case from being convicted on the basis of a prior crime. The question before the jury in any case is whether defendant is guilty of the crime charged in the indictment. The fact that a defendant may have been guilty of other crimes, or that he may generally be a bad person, would not be sufficient to convict him of a particular crime for which he is on trial. The circumstance that defendant committed perjury in a trial some six years prior to his murder trial, we believe, would not be likely to cause a jury to convict him of murder based only or substantially on that fact. There is a vast difference between the charge of perjury and a murder charge. While we believe that the prosecutor unnecessarily went beyond normal bounds in proceeding in this case, it is clear that the jury verdict could not have been based in any significant manner on defendant's guilt of a perjury charge, for which he had already served his punishment.

What had developed here is that there was an admission of a conspiracy to commit perjury. Perjury was admitted, but an exculpatory statement was made in connection with it. He was cross-examined regarding his exculpatory statement, but he also volunteered a statement justifying his action and was then examined again to respond to such statement by showing that he had not called the attention of the trial court to the so-called threats to his family. We believe that the Illinois Supreme Court stated the proper basis for consideration of this issue in *People v. Morehead* (1970), 45 Ill. 2d 326, 259 N.E.2d 8, *cert. denied*, 400 U.S. 945, 27 L. Ed. 2d 251, 91 S. Ct. 251, when the court said (at page 332):

> "It is not the policy of this court to reverse a judgment of conviction merely because error was committed unless it appears that real justice has been denied or that the finding of guilty may have resulted from such error. (*People v. Helm*, 40 Ill. 2d 39, 47; *People v. Armstrong*, 22 Ill. 2d 420, 424.)"

We believe it is not reasonable to assume the jury would infer a propensity to murder Tracy Sapp simply by virtue of the fact that defendant may have been involved in a perjury charge.

■■ Defendant makes a final contention that the remarks of the prosecutor, which we have quoted in full previously, in his rebuttal closing argument, were prejudicial and require reversal. We note that no objection was made at the trial to the remarks and that normally the error, if there was error, is considered to be waived. (*People v. Killebrew* (1973), 55 Ill. 2d 337, 303 N.E.2d 377; *People v. Simmons* (3d Dist. 1974), 21 Ill. App. 3d 310, 315 N.E.2d 226.) We believe that the comments, in the context in which they appear, obviously do not appear to be attempts to lead the jury to believe that the prosecutor had some special reason for feeling that defendant in the particular case was guilty. (*People v. Wilson* (3d Dist. 1970), 131 Ill. App. 2d 731, 264 N.E.2d 492.) When we view all of the closing arguments as a whole, we do not believe that the remarks objected to were such as to require reversal.

For the reasons stated, the judgment and sentence of the Bureau County Circuit Court in this cause are affirmed.

Affirmed.

STENGEL and SCOTT, JJ., concur.