THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WILLIAM FORD, Defendant-Appellant.

Third District   No. 77-513

Opinion filed March 19, 1980.—Rehearing denied May 5, 1980.

58

BARRY, J., dissenting.

Robert Agostinelli and Charles W. Hoffman, both of State Appellate Defender's Office, of Ottawa, for appellant.

Thomas J. Homer, State's Attorney, of Lewistown (John X. Breslin and Gary F. Gnidovec, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE ALLOY delivered the opinion of the court:

The defendant in this case, William Ford, appeals from convictions for the offenses of indecent liberties with a child (Ill. Rev. Stat. 1975, ch. 38, par. 11—4(a)(3)) and attempt (rape) (Ill. Rev. Stat. 1975, ch. 38, par. 8—4(a)). He was tried by a jury and sentenced by the court to a single term of 15 to 25 years in the Illinois Department of Corrections. He was 51 years old at the time of his arrest.

The complainant in the case was a 12-year-old girl, who testified that on May 13, 1977, at approximately 3:50 p.m., she was home alone watching television when a man she had never seen before came to the door, asking for directions. She noticed a green station wagon parked in the driveway. The man at the door told her that he was a friend of her grandparents and was supposed to visit them someday. He then asked to use the bathroom. When he emerged, the complainant asked him if he wished to call her grandparents and the man replied that he did not. She became frightened and began to cry. The man grabbed her, held her close to himself and kissed her, placing his tongue in her mouth. He said

that there must be a bedroom in the house and she replied that there was not. He then forced her upstairs and into a bedroom and told her to remove her clothes and get onto the bed. She removed all of her clothing except her shoes and socks and lay on the bed on her back. He removed his pants, but did not take off his undershorts. He got on top of her and kissed her on the mouth. He forced her to touch his genitals. She smelled alcohol on his breath. After about two minutes she told the man that she heard someone pulling into the driveway. The man got up to look out the window and the complainant ran downstairs and out the door. She ran a quarter mile to the home of her nearest neighbor. The neighbor testified that the complainant ran up to her house naked and yelling, "* * * come quick and help me. Hurry. I have been raped."

When questioned by Deputy Dan Daly of the sheriff's police, the complainant described the man as tall, between 5'9" and 6 feet, with brownish gray hair. He wore gold-rimmed bifocal glasses and a dirty white T-shirt, over which he wore a blue jean jacket. He wore green work pants and a black baseball cap. His undershorts were white with a red pattern.

After the complainant reached her neighbor's house, the neighbor called the police. Two other witnesses testified that they saw a dark green station wagon parked in the driveway of complainant's home at the time of the incident. Before the police arrived, the neighbor and the complainant observed a green station wagon going west past the house. The complainant said it was the same car she had seen in her driveway. Deputy Dan Daly of the sheriff's police and the complainant's parents then arrived at the neighbor's house. While they all were standing in the yard, the complainant noticed the car drive past again. She recognized the car and the black baseball cap and cried out, "There he is. Get him," and pointed. It was then 5:55 p.m. Deputy Daly noticed that Deputies Matt Bohler and Paul Ford were driving in a pickup truck about 300 yards behind the station wagon. Daly radioed them to stop the station wagon, and both he and the complainant's father entered their vehicles and followed the station wagon. Daly passed the other vehicles and ultimately stopped the station wagon south of Smithfield. The driver of the station wagon was the defendant, whom Daly had known since 1975. Defendant Ford was taken to the county jail. His car was left unattended on the road south of Smithfield.

After arriving at the sheriff's office, Daly asked Gerald Kinnamon to tow the defendant's car to the jail. When the car arrived at the jail, Daly noticed for the first time a light brown tool box behind the front seat of the floorboard. He testified that he had not looked for anything like that at the time of the arrest. While the car was parked along the rural road, it was unlocked and a window was open. At the jail, the defendant was

asked to empty his pockets. He removed his wallet and 20 or 30 drill bits. Deputy Daly testified that the defendant also removed a ball point pen and a packet of wood bits from his pockets. Attorney Bill Davis was at the jail at the time and was asked to take the personal property envelope to the defendant's wife. None of the contents was marked for identification.

The next morning, Saturday, May 14, 1977, the complainant's father reported to the sheriff that his toolbox and several drill bits and end wrenches were missing from his garage. The garage door was closed, but unlocked. He had last used his tools the previous morning. He identified the tool box that had been found in the defendant's car as his. Among the tools he was missing was a red container in which the bottom was falling out (People's exhibit No. 5). This held wood bits, among which was an antique bit that his wife's grandfather had given him (People's exhibit No. 9), which he claimed he could pick out of a hundred. He was also missing a feeler gauge, used in automotive tuneups (People's exhibit No. 6), and a ball point pen bearing the name of a local firm (part of People's exhibit No. 4).

Mrs. Ford testified that attorney Bill Davis came to her home on May 13 and told her that her husband was in jail. He brought her an envelope with some drill bits, loose change and her husband's billfold. She removed the change and billfold and took the drill bits to the basement where she dumped them into a box with other drill bits, nails and small objects. On May 14, the sheriff came to her house and stated that he wanted the drill bits for evidence. Mrs. Ford went to the basement, grabbed a handful of drill bits, put them in a coffee can and took them upstairs. She was not sure they were the same drill bits that Davis had brought her. The only items she identified as having been brought by Davis was People's exhibit No. 5, the packet of wood bits.

Ronald Hungerford, the defendant's 33-year-old nephew, testified that the defendant was at Hungerford's home in Cuba, Illinois, on May 13, 1977. On that date, at 3:15 p.m., the defendant drove up to Hungerford's yard and the two of them talked for 15 minutes to a half hour. The witness thought the defendant had been drinking because he was talking a little slower than normal. A half-pint bottle of liquor was found in defendant's station wagon at the time of his arrest.

The jury found the defendant guilty of indecent liberties with a child, attempt (rape), and contributing to the sexual delinquency of a child. Judgment of conviction was entered on the first two charges. The charge of contributing to the sexual delinquency of a child was withdrawn because that charge was a lesser included offense as to the conviction for indecent liberties.

The defendant's first contention on appeal is that the court erred in admitting into evidence, after a hearing on a motion to suppress, the drill

bits and other small tools that Mrs. Ford gave to Sheriff Ellsworth when he came to her house on May 14. The sheriff drove to Mrs. Ford's house in his police car, although he was in plain clothes and unarmed at the time. He was accompanied by his wife, who remained in the car. Mrs. Ford recognized him. Sheriff Ellsworth testified that he knew Mrs. Ford. Sheriff Ellsworth said to Mrs. Ford that, if she didn't mind, he would like to have the drill bits that Bill Davis had brought her the previous night, for evidence. Mrs. Ford went into the house and returned with a coffee can full of nails, drill bits, and other small tools. The evidence envelope was rolled up and stuffed into the can. She scooped up some drill bits, placed them into the envelope and handed the envelope to Sheriff Ellsworth. The drill bits thus seized were identified by the complainant's father at trial as being similar in appearance to the drill bits he was missing. Among the items turned over to Sheriff Ellsworth by Mrs. Ford was a red plastic case, smeared with paint and having a loose bottom. This case contained wood bits. Complainant's father identified it as being similar in appearance to one he was missing. Among the bits in this case was an antique wood bit which complainant's father testified he could identify from among a hundred.

Mrs. Ford testified that, after having been given the envelope by Bill Davis on the night of the 13th, she removed her husband's billfold and change and took the envelope to the basement, where she emptied the rest of its contents into a box containing her husband's small tools.

■■ The defendant argues that Mrs. Ford did not have common authority over the basement and the box wherein her husband, the defendant, kept nails and small tools. "[T]he consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." *United States v. Matlock* (1974), 415 U.S. 164, 170, 39 L. Ed. 2d 242, 249, 94 S. Ct. 988, 993.

■■ The defendant has correctly pointed out that "[c]ommon authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, see Chapman v. United States, 365 U.S. 610 (1961) (landlord could not validly consent to the search of a house he had rented to another), Stoner v. California, 376 U.S. 483 (1964) (night hotel clerk could not validly consent to search of customer's room), but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the coinhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." (*United States v. Matlock*

(1974), 415 U.S. 164, 171 n.7, 39 L. Ed. 2d 242, 250 n.7, 94 S. Ct. 988, 993 n.7.) The facts of this case indicate that Mrs. Ford did not possess a mere, technical property interest in the basement and the box such as would preclude her from consenting to their search. She both placed the bits with her husband's tools and extracted the bits from among those tools with apparently no hesitancy whatsoever. The evidence shows a mutual use of the basement and joint access to the tools, such that it is reasonable to recognize that Mrs. Ford had the right to permit the inspection in her own right and that Mr. Ford has assumed the risk that she might permit the common area to be searched. The evidence establishes a mutual use and control of the basement and the wife's right to access to the box of tools. The basement was not locked, and the wife was not instructed not to handle the tools. The mere fact that the defendant alone may have used these tools does not indicate that his wife was denied the mutual use, access to, or control over them. (See *People v. Stacey* (1974), 58 Ill. 2d 83, 89-90, 317 N.E.2d 24.) The court found by a preponderance of the evidence that Mrs. Ford had the requisite common authority and we cannot disagree with that finding.

■■ ■ The defendant further argues that Mrs. Ford's consent was not voluntary, but was the product of subtle coercion. The evidence clearly shows that Mrs. Ford and Sheriff Ellsworth knew one another. Sheriff Ellsworth was courteous toward Mrs. Ford, and in no way tried to deceive her. He told her forthrightly that he wanted the drill bits as evidence. He was accompanied by his wife, although his wife did remain in the sheriff's car. He was dressed in plain clothes and unarmed. Mrs. Ford was 23 years old at the time. The requested seizure occurred during daylight hours. "[W]hen the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given * * *. Voluntariness is a question of fact to be determined from all the circumstances * * *." (*Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 248-49, 36 L. Ed. 2d 854, 875, 93 S. Ct. 2041, 2059.) "The trial court's determination of the voluntariness of a consent is to be accepted on review unless its findings are clearly unreasonable." (*People v. Sommer* (1977), 45 Ill. App. 3d 459, 461, 359 N.E.2d 1190; *People v. DeMorrow* (1974), 59 Ill. 2d 352, 358, 320 N.E.2d 1, 5.) The trial court found that, under the totality of circumstances, Mrs. Ford's consent was voluntary and free from coercion. (Compare *People v. Haskell* (1968), 41 Ill. 2d 25, 241 N.E.2d 430; *People v. Lind* (1938), 370 Ill. 131, 18 N.E.2d 189.) This finding was clearly reasonable and will not be disturbed.

■■ The defendant further contends that it was improper for the sheriff to seek the evidence by consent at all and should have obtained a warrant.

He cites us to *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 227, 36 L. Ed. 2d 854, 863, 93 S. Ct. 2041, 2048, wherein the Supreme Court stated: "As with police questioning, two competing concerns must be accommodated in determining the meaning of a 'voluntary' consent—the legitimate need for such searches and the equally important requirement of assuring the absence of coercion." Despite its reference to "legitimate need," the Supreme Court does not go on to hold that a warrant must be obtained in all cases where it is possible to do so. In fact, the court says that even in "those cases where there is probable cause to arrest or search, but where the police lack a warrant, a consent search may still be valuable. * * * [A] search pursuant to consent may result in considerably less inconvenience for the subject of the search and properly conducted is a constitutionally permissible and wholly legitimate aspect of effective police activity." (*Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 228, 36 L. Ed. 2d 854, 863, 93 S. Ct. 2041, 2048.) An uncoerced consent search has consistently been held to be reasonable under the fourth and fourteenth amendments, and is a recognized exception to the general warrant requirement. (*Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 219, 36 L. Ed. 2d 854, 858, 93 S. Ct. 2041, 2043-44.) The actual seizure that occurred was less obtrusive of the rights of the defendant and his wife than a general search of their premises would have been. Moreover, the seizure here produced more reliable evidence than would a seizure of goods discovered by means of a search pursuant to a warrant. Mrs. Ford had been given custody of the evidence by Bill Davis. She knew where she had placed the drill bits and other items and was in a position to retrieve the same items that were in the defendant's pockets on the night of his arrest. We, therefore, hold that the failure to obtain a warrant did not violate the defendant's constitutional rights in this case.

The defendant also contends that the trial court erred in admitting into evidence People's exhibits Nos. 4, 5, 6 and 9, on the grounds that no proper foundation was laid for their admission. The defendant contends that such foundation was lacking because the admitted evidentiary items were neither subject to a continuous chain of custody by the police, nor were they positively identified at trial. People's exhibit No. 4 was the envelope into which the defendant placed the contents of his pockets on the night of his arrest. This envelope was delivered to Mrs. Ford that night and retrieved from her the next morning. Included in the exhibit were some drill bits and a plastic pen bearing an advertisement for a local firm. People's exhibit No. 5 was a small red case containing wood bits. Its bottom was loose, and it was smeared with paint. People's exhibit No. 6 was a gap thickness gauge, and People's exhibit No. 9 was an antique wood bit. Exhibits Nos. 5, 6 and 9 were all taken from the envelope of exhibit No. 4 for display in court.

■■■ "The use of physical objects before a jury falls into two categories: 1, real evidence, which Wigmore calls 'autoptic,' and 2, demonstrative evidence. * * * Real evidence involves the production of some physical object which had a direct part in the incident * * *." (*Smith v. Ohio Oil Co.* (1956), 10 Ill. App. 2d 67, 74-75, 134 N.E.2d 526.) A proper foundation for the evidence offered by the State in this case must consist of two parts. First, the evidence must be linked to the defendant. Second, it must be linked to the crime. (*People v. Rogers* (1976), 42 Ill. App. 3d 499, 502, 356 N.E.2d 413; *People v. Fair* (1977), 45 Ill. App. 3d 301, 304, 359 N.E.2d 848.) Regarding each of these foundation requirements, the following statement from McCormick, Evidence §212, at 527-28 (2d ed. 1972), is reflective of the law of this State:

> "It will be readily apparent that when real evidence is offered an adequate foundation for admission will require testimony first that the object offered is *the* object which was involved in the incident, and further that the condition of the object is substantially unchanged. If the offered item possesses characteristics which are fairly unique and readily identifiable, and if the substance of which the item is composed is relatively impervious to change, the trial court is viewed as having broad discretion to admit merely on the basis of testimony that the item is the one in question and is in a substantially unchanged condition. On the other hand, if the offered evidence is of such a nature as not to be readily identifiable, or to be susceptible to alteration by tampering or contamination, sound exercise of the trial court's discretion may require a substantially more elaborate foundation. A foundation of the latter sort will commonly entail testimonially tracing the 'chain of custody' of the item with sufficient completeness to render it improbable that the original item has either been exchanged with another or been contaminated or tampered with." *People v. Cole* (1975), 29 Ill. App. 3d 369, 375, 329 N.E.2d 880.

Although the drill bits were not readily identifiable for all purposes, they, along with the other items, could be sufficiently identified for the purposes for which they were introduced into evidence. (See *People v. Panus* (1979), 76 Ill. 2d 263, 270-71, 391 N.E.2d 376.) Therefore, the challenged exhibits fall within the first category outlined by McCormick, *i.e.*, items which are identifiable and relatively impervious to change. Deputy Daly testified that the defendant, while at the jail after his arrest, emptied his pockets. He removed from them 20 to 30 drill bits, which were placed in an envelope (People's exhibit No. 4). Bill Davis also saw the defendant remove between 10 and 30 drill bits from his pocket and place them into an envelope. Deputy Daly saw the defendant remove from his pocket a pen, which the deputy identified as being the pen in

People's exhibit No. 4. Deputy Daly testified that he also saw People's exhibit No. 5 (the red case of wood bits, containing among them People's exhibit No. 9, the antique bit) come out of defendant's pocket on the night of his arrest. Thus, there is sufficient identification evidence to link the evidentiary items of People's exhibits Nos. 4, 5, and 9 with the defendant on the night of his arrest. Furthermore, there is evidence of a continuous chain of custody of these items. There was testimony to the effect that all of these items remained in the custody of the Sheriff's police from the time Sheriff Ellsworth seized them from the Ford home on the morning of May 14, until they were brought to the trial. Sheriff Ellsworth had custody of them on the morning of the 14th. He gave the envelope, containing all the other items of evidence in question to Deputy Daly, who inventoried them and kept custody of them until the trial. People's exhibit No. 6, not specifically identified by Deputy Daly as having come out of defendant's pockets on the night of his arrest, was among those items.

We need not rule upon the question of whether there was a continuous chain of custody from the time of defendant's arrest until the time of trial. The items of evidence went from the custody of the sheriff's police to that of Bill Davis. Bill Davis delivered them to Mrs. Ford, and the sheriff's office again came to possess them after they were given to Sheriff Ellsworth by Mrs. Ford. "It is obvious that an item which we call real evidence does not in fact become evidence at all until the investigation focuses on it and it becomes apparent that it should be considered as possible evidence in a particular case. Then, the obligation to preserve such an item against the possibility of substitution, alteration and tampering accrues and the chain of custody or possession begins." (*People v. Cole* (1975), 29 Ill. App. 3d 369, 376, 329 N.E.2d 880.) It was not until the morning of the 14th that the complainant's father reported to the sheriff that he was missing tools. Sheriff Ellsworth then quickly proceeded to the Ford home and obtained Mrs. Ford's consent to seize the items. From that time forward, a sufficient chain of custody was maintained so that the introduction of these items from the defendant's home establishes a sufficient linkage between the items and the defendant.

As to the second foundation requirement, the linkage between the evidentiary items and the crime, this was provided by the testimony of the complainant's father. He identified all of the items in question as being similar to items that were missing from his garage on the morning after the attack upon his daughter. The antique drill bit and the red plastic case with the loose bottom and paint smear are clearly readily identifiable. The drill bits were identified as being of the same general size and type as those taken from the garage. The same is true of the gap gauge. The ballpoint pen bore the same advertisement as the missing pen.

■■ The defendant argues that the father failed to make a positive identification of these items because he acknowledged on cross-examination that these items were fairly readily available, and others like them, besides his own, might exist. He, therefore, couldn't be absolutely certain that these items were his. We think that the witness, in acknowledging less than absolute certainty in his identification of these small tools, may have merely been displaying commendable fidelity to his oath. A reasonable jury might well have found reasonable certainty in this witness' identification. Items identified with far less certainty have been properly admitted into evidence. (See *People v. Smith* (1965), 63 Ill. App. 2d 369, 377-78, 211 N.E.2d 456; *People v. Fair* (1977), 45 Ill. App. 3d 301, 305, 359 N.E.2d 848.) The propriety of receiving physical evidence rests primarily within the discretion of the trial judge, and exercise of that discretion will not be interfered with absent abuse which prejudices the defendant. (*People v. Fair* (1977), 45 Ill. App. 3d 301, 305, 359 N.E.2d 848.) We believe that the items were sufficiently identified and connected with the defendant and the crime to permit their admission into evidence. It was then for the jury to weigh and determine, as a matter of fact, the question of the identity of the items and their effect, if any, as proof. *People v. Smith* (1965), 63 Ill. App. 2d 369, 378, 211 N.E.2d 456.

The defendant claims that there is evidence of tampering with the evidentiary items such as would negate the foundations of identification and continuing custody. Sheriff Ellsworth testified that the envelope containing the evidence, after some days in Deputy Daly's custody, felt heavier than it had after its seizure from the Ford home. "The rule that an object must be in substantially the same condition when offered in evidence as it was when the crime was committed does not require the prosecution to exclude all possibility that the article may have been tampered with; rather, the court must be satisfied that in reasonable probability the article has not been changed in any important aspect." (*People v. Marquis* (1974), 24 Ill. App. 3d 653, 662, 321 N.E.2d 480, 487.) We think the trial court acted well within its discretion in admitting these items of evidence. Such testimony as was presented regarding tampering with the physical evidence was a matter to be considered by the jury in weighing and evaluating the evidence.

■■ The defendant argues that the trial judge had ruled improperly against him on a motion *in limine* whereby the defendant moved to prohibit introduction at trial of a past criminal conviction for impeachment purposes. The defendant's last prior conviction had been in 1964, when he was convicted in California of first degree murder. Later, the California courts reduced his crime to second degree murder, a crime which bore a penalty of from five years to life in prison. The defendant argues that, under the rule of *People v. Montgomery* (1971), 47 Ill. 2d 510,

268 N.E.2d 695, this conviction was too remote to be introduced against him, because the conviction occurred over 10 years before the instant proceeding and there was no showing that the defendant had been incarcerated within 10 years prior to the instant proceeding. The defendant claims that the judge's finding that he had been incarcerated within the prior 10 years was mere speculation based upon the sentence he ultimately received for his 1964 conviction. (See *People v. Yost* (1978), 65 Ill. App. 3d 386, 390-91, 382 N.E.2d 140, *aff'd,* 78 Ill. 2d 292, 399 N.E.2d 1283.) There is no basis for defendant's contention. An FBI report, indicating that the defendant was in custody for this 1964 murder conviction until 1975, when he was paroled, was introduced at the hearing *in limine.* The court, in its rectified report of proceedings, recorded the introduction, without objection, of the FBI report. The court, in denying defendant's motion to prohibit the introduction of his criminal record into evidence, made mention of defendant's "recent release" from prison. No one denies the accuracy of the FBI report. We, therefore, find the judge's ruling against the defendant on the motion *in limine* to have been proper.

The defendant next contends that he was denied his constitutional right to a fair trial by improper comments of the prosecutor in closing arguments. The defendant argues that the prosecutor improperly bolstered the credibility of the complaining witness by expressing his personal opinion of her veracity. The complained of remarks were:

> "Then, as you know, which is something that really impresses me at least, is that one of [the complainant's] first thoughts here was to call her sister * * *·and she had [her neighbor] call * * * and say, 'Don't go home.', because as far as [she] knew at that time the defendant was still in that house."

and

> "I have to admit to you I should be ashamed of myself because I think that [she] did one heck of a lot better job in remembering many details than I could have ever done. I'm not as observant as she is, a 12 year old girl. I think it would also help us to remember and one thing that always impresses me in this regard as I look at other things that come out that appear to be inconsistencies, a short quote from Mark Twain. He said, 'Beware of consistencies. They are the stuff of which novels are made, not real life.' and I am impressed by that because when I see people up here and they say something they know that is going to hurt their case or it doesn't look like some of the other testimony might be right, but they tell me that and I believe the other things they tell me because I know that they are being honest with me."

In addition, the defendant contends that the prosecutor expressed his

personal opinion of defendant's guilt through the following statement in his closing argument:

"Now I suppose the first question that we would have in a case like this really, is did this incident happen at all because some of you have had 12 year old girls or sons. You know that from time to time that children are prone to fabricate or use their imagination or exaggeration and this is a question we always have when we have a complaint of this nature. But there are just too many coincidences in this case, if you want to call them that, which lead us to believe that it did, in fact, happen."

We agree with defendant that a prosecutor may not personally vouch for the character or credibility of the State's witness. (*People v. Valdery* (1978), 65 Ill. App. 3d 375, 381 N.E.2d 1217; *People v. Bolton* (1976), 35 Ill. App. 3d 965, 343 N.E.2d 190.) Nor is it proper for a prosecuting attorney to state his own individual opinion or belief of the defendant's guilt. *People v. Hopkins* (1970), 124 Ill. App. 2d 415, 259 N.E.2d 577; *People v. Thomas* (1974), 22 Ill. App. 3d 854, 318 N.E.2d 342.

None of these remarks was objected to at trial. The failure to make a timely objection to allegedly improper remarks by the prosecutor effects a waiver of that objection. (*People v. Skorusa* (1973), 55 Ill. 2d 577, 585, 304 N.E.2d 630.) The error must somehow be brought to the attention of the trial court so that the court has an opportunity to correct the error by appropriately instructing the jury. Nevertheless, the appellate court may consider assignments of error relating to seriously prejudicial arguments of counsel, even though no objection was made at trial. (*People v. Young* (1975), 33 Ill. App. 3d 443, 447, 337 N.E.2d 40.) Even though the court may relax the waiver rule, the case should not be reversed unless the closing argument of the prosecutor, which was not objected to at trial, is so prejudicial and inflammatory that it deprives the defendant of a fair trial and was a material factor in the guilty verdict of the jury. *People v. Young* (1975), 33 Ill. App. 3d 443, 447, 337 N.E.2d 40.

All of the objected to remarks set out above reflected upon the credibility of the complaining witness. Yet, a reading of the defense attorney's closing argument reveals his concurrence as to the credibility of the complaining witness. Defense attorney, in his closing argument, stated: "So, we have, really, a girl who seems to pay great attention to detail, and I believe she does and I believe that the individual out at her home on the 13th fit exactly what she said he did." The theory of defendant, as set out by his counsel's closing argument, is that the complainant accurately described to Deputy Daly and to the Assistant State's Attorney the man who came to her house: That man wore green work pants, whereas the defendant wore blue jeans at the time of his

arrest. That man wore a heavy jeans jacket; the defendant wore a Levis work shirt. The man wore red and white boxer shorts; the defendant wore blue and white boxer shorts. That man parked a dark green station wagon in her driveway; the defendant drove a light green station wagon. That man had alcohol on his breath; there was no clear evidence that the defendant had been drinking at the time of his arrest. According to defense counsel, the complainant's pointing out the defendant as he drove past was based solely on her observation of his black hat and green station wagon.

Nor was it defendant's claim that no attack had occurred. The fact that the complainant's description of her assailant's underpants was dwelled upon by the defense attorney as an accurate description, one which was at variance with the actual color of defendant's underpants, indicates that the defense had no interest in denying that the man at the complainant's house had removed his trousers. Nor, we might add, in view of the fact that the complainant ran a quarter mile to her neighbor's house, naked and crying, can it be credibly maintained that nothing untoward occurred at her house.

The defendant's position was that he was simply not the man who attacked the complainant. His argument was that the complainant only identified him after the Assistant State's Attorney had improperly suggested to her that she was to select his picture from among a group of photographs shown to her three days after the incident. Subsequently, she was pressured to identify him in the courtroom. The defendant argued at trial that, had he been put before the complainant in a lineup immediately after his arrest, she would not have identified him as her assailant.

■■ Because the credibility of the complainant was conceded by the defendant at trial, we find that the prosecutor's comments upon her credibility, even had those comments reached the level of personal vouching, an issue we need not decide here, did not prejudice the defendant. Therefore, the defendant's failure to object to these remarks at trial constitutes waiver of error on appeal.

■■ Two additional remarks by the prosecutor, which defendant claims to be prejudicial, do bear directly upon the defense. These remarks relate to the complainant's selection of the defendant from a group of photographs she was shown on May 16, three days after her attack. The prosecutor stated in his closing arguments:

> "In fact, as you heard the testimony, we had taken different glasses or we had taken his glasses off in this picture. Here's the picture in here. There's 13 photographs in all and he has on different clothes than he did that day and is cleaned up. He's got the hat removed. These were the pictures given to her on that day because, as I say, when you have a little girl you want to make sure, or anybody. We

are talking about a serious charge here. We want to make sure that she is certain about who did it."

The defendant argues that this statement by the prosecutor constitutes prejudicial error because, in making the statement, the prosecutor implied to the jury that he would not have prosecuted the defendant had he not been sure of his guilt. It is improper argument for a prosecutor to make a statement to the effect that he would not have brought a case to trial were he not convinced of the defendant's guilt. (*People v. Hopkins* (1970), 124 Ill. App. 2d 415, 418, 259 N.E.2d 577; *People v. Fuerback* (1966), 66 Ill. App. 2d 452, 456, 214 N.E.2d 330.) The reason for this rule is that "it is highly improper for the prosecutor to do or say anything whose only effect will be to inflame the passion or arouse the prejudices of the jury against the accused, without throwing any light upon the case at hand." (*People v. Bitakis* (1972), 8 Ill. App. 3d 103, 108, 289 N.E.2d 256.) A prosecutor may not state his own opinion because this places the prestige of his office behind his assertion and places before the jury the prosecutor's own testimony. This is improper because it is not based upon evidence adduced at trial and implies special knowledge by the prosecutor. (See *People v. Wilson* (1970), 131 Ill. App. 2d 731, 739, 264 N.E.2d 492; *People v. Callinan* (1976), 44 Ill. App. 3d 18, 25, 357 N.E.2d 1291.) The remark of the prosecutor objected to here does not bear these objectionable characteristics. It is a proper comment upon the evidence in an attempt to draw a reasonable inference from evidence properly elicited at trial. (See *People v. Prim* (1972), 53 Ill. 2d 62, 77, 289 N.E.2d 601; *People v. Hill* (1977), 45 Ill. App. 3d 14, 358 N.E.2d 1350.) The inference drawn is that the photo identification of defendant was fair and accurate. The defense, in its questioning of the complainant and of Deputy Daly, made reference to the fact that no lineup was held. Defense counsel questioned Deputy Daly about the accuracy of a photographic identification as compared with a lineup. Deputy Daly responded that he thought a lineup was generally preferable, but that in this case the photographic identification was more desirable because there were few inmates in the county jail at the time, and none of them bore a physical resemblance to the defendant. The defense counsel stated in his closing argument that, had there been a lineup, the complainant would not have identified the defendant as her assailant. The remark of prosecutor objected to here amounted to an explanation of why the photo identification was used. As such it was a legitimate comment on the evidence.

Another remark by the prosecutor, complained of here, also concerns the photo identification of defendant. At trial, the complainant testified to having made a pretrial photographic identification of the defendant on May 16, 1977, at the State's Attorney's office. On that date, she had been

shown 13 photographs and had selected a photograph marked "11". The photographs were numbered randomly; they were not numbered "1" to "13". The Assistant State's Attorney handed her the same 13 photographs in court on August 12, 1977, at a hearing on defendant's motion to suppress identification. On that occasion, the Assistant State's Attorney stated that he was handing her "11" photographs. The defense maintains that this constituted suggestion by the Assistant State's Attorney that the complainant was to choose photo number "11". At trial, the complainant denied that the Assistant State's Attorney had stated "11" or any other number when he handed the stack of photographs to her on May 16. The testimony of Deputy Daly, who was present at the May 16 photo identification, did not contradict the complainant, although there is no showing that he was questioned directly on this point.

In his closing arguments, the Assistant State's Attorney stated:

"Without question, without any doubt, after looking at all the pictures, she picked out Number "11", who is Bill Ford. Now when I handed those pictures to her later on August 12th and said there were eleven (11) photographs there and the record shows that I did say that. It was the first time I was even aware of it and it is my mistake and I apologize for having said that. I am convinced I know I didn't say it the first time she picked them out. Why I said there were eleven (11) pictures there, I can assure you in all honesty, I didn't mean to imply that that was Number "11" on there."

Most of the Assistant State's Attorney's remark was proper commentary on evidence that had been placed before the jury, evidence intended by the defense to show that the Assistant State's Attorney had suggested to the complainant that she choose photo number "11" during her May 16 identification. However, the prosecutor went beyond proper comment on the evidence when he stated, "I am convinced I know I didn't say it the first time she picked them out." It is improper for a prosecutor to get before a jury that which amounts to his own testimony, unsworn and not subject to cross-examination. *People v. Rothe* (1934), 358 Ill. 52, 56, 192 N.E. 777; *People v. Vasquez* (1972), 8 Ill. App. 3d 679, 681, 291 N.E.2d 5.

■■ Despite this error, we do not think that the defendant was deprived of a fair trial. The improper "testimony" of prosecutor was merely cumulative of proper testimony given by the complainant as to what transpired at the photographic identification of May 16. "Where it appears that improper remarks do not constitute a material factor in the conviction, or that they are of such a minor character that prejudice to defendant is not their probable result, the verdict will not be disturbed." (*People v. Berry* (1960), 18 Ill. 2d 453, 458, 165 N.E.2d 257.) "The question is not whether the record is perfect, but whether the defendant has had a

fair trial and whether his conviction is based on evidence establishing his guilt beyond a reasonable doubt." (*People v. Smith* (1965), 63 Ill. App. 2d 369, 384, 211 N.E.2d 456.) In view of the overwhelming evidence of defendant's guilt, we find that the minor error committed by the prosecution did not deprive the defendant of a fair trial and was harmless beyond a reasonable doubt.

■■ The defendant's final contention is that his conviction for attempt (rape) should be vacated because the same act was used to show the attempted rape as had formed the basis for his conviction for indecent liberties with a child. Both the defendant and the State acknowledge that the rule of *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, is controlling. Each thinks that that decision supports its contention in this case. In *People v. King,* our supreme court held:

> "Prejudice results to the defendant only in those instances where more than one offense is carved from the same physical act. Prejudice, with regard to multiple acts, exists only when the defendant is convicted of more than one offense, some of which are, by definition, lesser included offenses. Multiple convictions and concurrent sentences should be permitted in all other cases where a defendant has committed several acts, despite the interrelationship of those acts. 'Act,' when used in this sense, is intended to mean any overt or outward manifestation which will support a different offense. We hold, therefore, that when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser included offenses, convictions with concurrent sentences can be entered." (66 Ill. 2d 551, 566.)

The defendant here was found guilty of contributing to the sexual delinquency of a child, indecent liberties with a child, and attempt (rape). The State's Attorney conceded that contributing to the delinquency was a lesser included offense of the indecent liberties conviction, and no judgment was entered on the contributing to the delinquency charge. A judgment of conviction was entered for the charges of indecent liberties with a child and attempt (rape) and a single sentence of 15 to 25 years was entered. Because this sentence exceeded the maximum sentence of 20 years for attempt (rape), the State argues that this sentence was for indecent liberties only, and asks us to remand for the imposition of a concurrent sentence for the attempt (rape) conviction. We agree with defendant that attempt (rape) is not, by definition, a lesser included offense of indecent liberties with a child. The information charges defendant with indecent liberties with a child, in that he "did perform an act of lewd fondling and lewd touching on * * * a child under the age of 16 years, done with the intent to arouse or satisfy the sexual desires of

either [the child] or himself, in violation of Chapter 38, section 11—4(a)(3), Illinois Revised Statutes, 1975." The information goes on to charge the defendant with attempt (rape), in that he "with the intent to commit the offense of rape, in violation of Sec. 11—1(a), Chap. 38, Illinois Revised Statutes, did perform a substantial step toward the commission of that offense, in that he ordered * * * a female and not his wife, to remove her clothing, and did remove his own pants, and force himself on top of the said * * * by force and against her will, in violation of Chapter 38, section 8—4(a), Illinois Revised Statutes, 1975."

In response to defendant's motion for a bill of particulars, the State provided him with a transcript of a statement made by the complainant in the State's Attorney's office on May 16, 1977, and a two-page police report made by Deputy Dan Daly on May 18, 1977. The acts specified in these two documents included: "French kissing" of the complainant by the defendant, forcing the complainant upstairs, ordering the complainant to remove her clothing, removal by the defendant of his trousers (but not his underpants), lying on top of the complainant, and kissing the complainant while lying atop her. The complainant's statement in court, on cross-examination, that the defendant had forced her to touch his genitals is not included in this bill of particulars and was, in fact, specifically denied by the complainant in her statement which served as part of the State's answer to one of the defendant's requests for particulars. Therefore, the evidence that the defendant had forced the complainant to touch his genitals was not properly before the court and may not be considered. Ill. Rev. Stat. 1975, ch. 38, par. 111—6.

The State maintains that separate acts support the two charges. The attempt (rape) charge is based upon the allegations that defendant "ordered the complainant to remove her clothing, and did remove his own pants, and force himself on top of [her] by force and against her will." The charge of indecent liberties is based upon the accusation of "lewd fondling or touching." (Ill. Rev. Stat. 1975, ch. 38, par. 11—4(a)(3).) If we are to accept the State's position this lewd fondling or touching must have consisted of the defendant's kissing of the plaintiff and inserting his tongue in her mouth while they were both on the first floor of her house, and later, his kissing of her while he was laying on top of her in bed. It is established that kissing may constitute such lewd conduct as would support a charge of indecent liberties with a child. (*People v. Kirilenko* (1953), 1 Ill. 2d 90, 115 N.E.2d 292.) Therefore, there is some merit to the State's contention that the two offenses were grounded upon separate acts as defined in *King* ("any overt or outward manifestation which will support a different offense").

■■ We note, however, that there is a precedential tradition in this State holding that the charges of indecent liberties with a child and of another

sex offense cannot be founded on a single act of the defendant. (*People v. Lilly* (1974), 56 Ill. 2d 493, 309 N.E.2d 1.) *Lilly* was not overruled by *King*, and has been cited for this proposition several times since the decision in *King*. (See, *e.g.*, *People v. Ross* (1978), 60 Ill. App. 3d 857, 377 N.E.2d 230; *People v. Thompson* (1978), 57 Ill. App. 3d 134, 372 N.E.2d 1052.) It is argued by the State that these cases all involve the charges of indecent liberties with a child and rape, and that a single act of intercourse was alleged to support both charges. While this is so, we note that the committee comments to section 11—4 state that the "language of subsection (a)(3) [lewd touching] is probably broad enough to encompass those acts more specifically described in the two preceding subsections [sexual intercourse and deviate sexual conduct]." (Ill. Ann. Stat., ch. 38, par. 11—4, Committee Comments, at 210 (Smith-Hurd 1979).) Under the State's theory, therefore, every rape or act of deviate sexual assault upon a child could also support a conviction for indecent liberties, provided the indictment or information alleged lewd fondling or touching under section 11—4(a)(3), and any kissing or fondling had actually accompanied the penetration or deviate sexual conduct. We do not think that the result in *Lilly* and the cases following it would have been different had the State indicted those defendants for indecent liberties based on "lewd touching or fondling" rather than for indecent liberties based on intercourse. See, *e.g.*, the facts in *People v. Ross* (1978), 60 Ill. App. 3d 857, 377 N.E.2d 230, where both deviate sexual conduct and lewd kissing accompanied the rape.

We find, therefore, that the charges of which the defendant was convicted arose from a single act, and that only the greater offense may be sustained. We, therefore, remand with directions that the trial court vacate the judgment of conviction for attempt (rape). We affirm the conviction for indecent liberties with a child. We note that the act of lewd fondling and touching of which the defendant was convicted consisted of all of the particulars set out in the bill of particulars. Therefore, the trial judge is not constrained in imposing sentence to consider only the lewd kissing, as the State's theory that only such kissing constituted indecent liberties was advanced for the first time on appeal, and is, therefore, not binding on the court. Furthermore, this decision does not disturb the jury's finding that the defendant committed a substantial step toward the act of forcible intercourse with the intent of raping the complainant. This finding may properly be considered by the judge in resentencing. We conclude that, under the facts of this case, the imposition of a single sentence of 15 to 25 years did not display an abuse of discretion by the trial judge, even had such sentence been imposed only for the crime of indecent liberties, which, as we have said, encompassed all of the allegations set forth in the bill of particulars. (*People v. Ross* (1978), 60 Ill.

App. 3d 857, 865, 377 N.E.2d 230.) Contention is made that the conviction of defendant for two distinct crimes was considered and could have been reflected in the severity of the sentence imposed as to defendant. Accordingly, since no specification is shown as to sentence imposed, the conviction for indecent liberties with a child is affirmed, but the conviction for attempt (rape) is vacated, and sentence is vacated and this cause is remanded for resentencing on the conviction of indecent liberties with a child. See *People v. Guppy* (1975), 30 Ill. App. 3d 489, 333 N.E.2d 576.

Conviction for indecent liberties affirmed; conviction for attempt (rape) vacated. Cause remanded solely for resentencing on the indecent liberties conviction.

STOUDER, P. J., concurs.

Mr. JUSTICE BARRY, dissenting:

Although I agree with much of the majority's opinion, I am compelled to dissent in this case because I believe the defendant's conviction for attempt rape should not be vacated. Under *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, multiple convictions were proper here.

In *King*, the supreme court stated:

"Prejudice results to the defendant only in those instances where more than one offense is carved from the same physical act. Prejudice, with regard to multiple acts, exists only when the defendant is convicted of more than one offense, some of which are, by definition, lesser included offenses. Multiple convictions and concurrent sentences should be permitted in all other cases where a defendant has committed several acts, despite the interrelationship of those acts. 'Act,' when used in this sense, is intended to mean any overt or outward manifestation which will support a different offense. We hold, therefore, that when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser included offenses, convictions with concurrent sentences can be entered." (66 Ill. 2d 551, 566, 363 N.E.2d 838, 844-45.)

In the offense report supplied to the defendant in response to his bill of particulars, Officer Daly reported that the complainant told him that while still downstairs the "subject pulled her to him and french kissed her." Although the majority admits that "kissing may constitute such lewd conduct as would support a charge of indecent liberties with a child," it subsequently comes to the conclusion that only one offense may stand

because the indecent liberties and attempt rape charges arose out of the same physical act.

I disagree, and believe that there are two physical acts which support the entry of two convictions. There can be little doubt that the defendant's embrace of the complainant and simultaneous French kissing of her downstairs constituted the offense of indecent liberties with a child under section 11—4(a)(3) of the Criminal Code (Ill. Rev. Stat. 1977, ch. 38, par. 11—4(a)(3)). On this point, the statements of the supreme court in *People v. Kirilenko* (1953), 1 Ill. 2d 90, 96, 115 N.E.2d 297, 300, are particularly apt:

> "While a kiss may bear connotations of love, respect, saluation or forgiveness under proper circumstances, it should also be recognized that the bodily contact established by kissing often serves as a preliminary stimulant for arousing or appealing to sexual passions and desires."

The embracing and kissing of the 12-year-old complainant by the 52-year-old defendant was obviously done with the intent to arouse the sexual desires of either or both of them, and this conduct alone supports the indecent liberties conviction. More importantly, however, that conduct is totally distinct and separate from the kissing and associated acts performed in another part of the house, upstairs, which led to the attempt rape conviction. Reference to a statement this court made in *People v. Schultz* (1979), 73 Ill. App. 3d 379, 392 N.E.2d 322, is useful in determining whether there was one act or several acts for *King* purposes. In *Schultz*, relying upon the factors utilized by the supreme court in *People v. Cox* (1972), 53 Ill. 2d 101, 291 N.E.2d 1, this court stated:

> "If, after an examination of several factors—time interval between acts; identity of the victim; location of the acts; *and* whether or not those acts fall within the same section of the Criminal Code—it is obvious that the defendant has committed several acts which give rise to more than one offense, none of which are lesser included offenses, then multiple convictions are proper under *King*." 73 Ill. App. 3d 379, 385, 392 N.E.2d 322, 327.

Applying this test to the facts of the instant case, there apparently was not a lengthy time interval between the embrace and kissing downstairs and the acts constituting the attempt rape. However, the acts were not simultaneous, nor almost simultaneous, so as to suggest one continuous act. (See *Schultz*; compare *People v. Manning* (1978), 71 Ill. 2d 132, 374 N.E.2d 200; *People v. Cox* (1972), 53 Ill. 2d 101, 291 N.E.2d 1; *People v. Jackson* (1978), 64 Ill. App. 3d 159, 380 N.E.2d 1210; *People v. Tate* (1976), 37 Ill. App. 3d 358, 346 N.E.2d 79.) Although the complainant was the victim in both instances, the acts occurred in different rooms of the house and are proscribed by different sections of the Criminal Code.

78

Taking all this into consideration, it seems clear that the defendant has "committed several acts which give rise to more than one offense, none of which are lesser included offenses * * *" (*Schultz*, 73 Ill. App. 3d 379, 385, 392 N.E.2d 322, 327), and consequently multiple convictions are proper under *King*. I would affirm both the indecent liberties and attempt rape convictions.